UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
LAQUANA CAMPOS, on behalf of herself and her
minor child, K.C.; TOSHA ADAMS; NORMAN
MARSH; and BETTI RODNYANSKAYA,
individually and on behalf of all persons similarly
situated,

                         Plaintiffs,                      Case No. _____

           -against-                        **CLASS-ACTION**
                                          **COMPLAINT**
KILOLO KIJAKAZI,
Acting Commissioner of Social Security,           **JURY TRIAL DEMAND**

                      Defendant.
------------------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.     Plaintiffs LaQuana Campos, on behalf of herself and minor child K.C., Tosha Adams, Norman Marsh, and Betti Rodnyanskaya bring this class action on behalf of themselves and a class of all current and future recipients of Supplemental Security Income ("SSI"), comprising thousands of very low income older adults and people with disabilities, who were harmed by an arbitrary and capricious rule change by the Social Security Administration ("SSA" or the "Agency") during the COVID-19 pandemic. That conduct caused, and is continuing to cause, injury to Plaintiffs and the proposed class by wrongfully imposing penalties that have the effect of reducing their benefits, risking harm to their health and safety.

2.     The global COVID-19 pandemic brought the United States to a screeching halt by March 2020. By the end of September 2020, more than seven million people in the United States

had contracted COVID-19 and 208,881 had died.[1] As of September 10, 2021, more than 40.1 million people had contracted COVID-19 and 654,598 had died.[2]

3.      The pandemic era has been especially devastating for individuals receiving SSI. These individuals are elderly or disabled (or both), and live in deep poverty. They depend on SSI to meet their basic requirements for shelter, food, and clothing.

4.      In March 2020, then-President Trump issued a Proclamation declaring a National Emergency related to the pandemic, Federal Register, Vol. 85, No. 53, 15337-15338 ("COVID-19 National Emergency"). Given the National Emergency and consistent with federal, state, and local requirements, many governmental and private entities have taken measures to reduce the spread of COVID-19 and the sometimes fatal associated risks. On March 17, 2020, SSA closed its field offices across the country and suspended many of its operations, including, importantly, workstreams related to determining eligibility of SSI recipients.[3]

5.      The closure of SSA's field offices, along with other society wide closures related to the pandemic, severely impaired SSI recipients' ability to report information to SSA that is critical to maintaining their eligibility (and thus, their benefits). Specifically, SSI recipients must demonstrate that they meet strict income and resource limits each month. SSI recipients must also promptly report any changes in their finances to SSA. Failure to do so may result in SSA recouping benefits that the Agency believes have been "overpaid" in past months—that is, paid out to recipients during time periods they were not in fact eligible.

6.      Before the pandemic, millions of SSI recipients regularly reported changes in their finances to SSA in person at local field offices. But since that option was foreclosed by the closure

---

[1] https://jobapscloud.com/MD/sup/bulpreview.asp?R1=18&R2=002588&R3=0007
[2] https://www.statista.com/statistics/1103185/cumulative-coronavirus-covid19-cases-number-us-by-day/
[3] https://www.ssa.gov/news/press/releases/2020/#3-2020-2

of SSA field offices at the start of the pandemic, these SSI recipients have instead been required to report any financial changes to SSA solely by phone, facsimile or mail. Many have not been able to do so. These recipients—who are disabled, elderly, or both—are at high risk for serious consequences from COVID-19, which limits their ability to venture into their communities to secure needed documentation, go to the post office or to send faxes to SSA.

7.     Meanwhile, even with respect to those SSI recipients who were able to report their financial changes, SSA often has not processed the updated information for many months. As a result of this failure, when SSA later identifies that the recipient was "overpaid" during each of those many months, the recipient faces recoupment going forward—resulting in a meaningful reduction of each month's benefits.

8.     Much of the SSA workload related to assessing overpayments remained suspended until September 2020, and to date, SSA's field offices still remain closed.

9.     In August 2020, recognizing that the pandemic caused severe and unfair harm to SSI recipients, SSA issued an interim final rule with the stated purpose of bringing relief to SSI recipients and reducing the administrative burden on the agency through the use of a streamlined, no-fault waiver of certain overpayments. *Waiver of Recovery of Certain Overpayment Debts Accruing During the COVID-19 Pandemic Period* (Fed. Reg. Vol. 85. No. 167, 52909-52915, Aug 27, 2020) ("Rule" or "IFR").

10.     Although implementing an effective and comprehensive no-fault and streamlined waiver process is essential to ensure the health and safety of SSI recipients during the pandemic, the IFR as drafted does not do so, and is arbitrary and capricious. It is deeply flawed in scope; its implementation has been flawed; and the notices sent by SSA to potentially affected recipients were also flawed.

3

11.    For example, the IFR contains numerous arbitrary limitations on when a recipient qualifies for the streamlined waiver: e.g., the overpayment must have occurred before September 30, 2020; SSA must have identified it by December 31, 2020; the overpayment must have been handled a certain way by SSA's internal systems (further described below); and SSA fails to inform recipients of the new policy, leaving the burden on the recipient to learn about the new waiver process and to affirmatively request such a waiver.

12.    In September 2020, SSA resumed some workloads and began to assess overpayments again, resulting in reductions of benefits—all while its field offices remain closed to recipients due to the ongoing COVID-19 National Emergency.

13.    The arbitrary limitations on the IFR's applicability have resulted in many SSI recipients being assessed overpayments and thus experiencing unfair and improper benefit reductions, causing substantial harm.

14.    The harm to SSI recipients stems from the IFR's facial arbitrariness, the SSA's inadequate implementation of the Rule, the SSA's failure to adequately notify SSI recipients of their rights under the IFR, and related Agency actions.

15.    SSA's arbitrary and capricious conduct violates the Social Security Act, the Administrative Procedure Act, and the Due Process and Equal Protection guarantees of the Fifth Amendment to the U.S. Constitution. Accordingly, Plaintiffs seek class-wide injunctive and declaratory relief.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1361 and 2201, and 42 U.S.C. §§ 405(g) and 1383(c)(3).

17.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. §§ 405(g) and 1383(c)(3), because it is the judicial district in which a substantial portion of the events and omissions giving rise to the claim occurred; specifically, it is the judicial district in which Ms. Campos, Ms. Campos's minor child K.C., Ms. Adams, and Ms. Rodnyanskaya reside, and to which Defendant sent Overpayment Notices for those individuals.

## PARTIES

18.    Plaintiff LaQuana Campos is a 36-year-old SSI recipient who lives in Brooklyn, New York. Ms. Campos brings this action both on behalf of herself and on behalf of her minor child, K.C. K.C. is a 14-year-old SSI recipient who lives in Brooklyn, New York.

19.    Plaintiff Tosha Adams is a 60-year-old SSI recipient who lives in Brooklyn, New York.

20.    Plaintiff Norman Marsh is a 73-year-old SSI recipient who lives in the Bronx, New York.

21.    Plaintiff Betti Rodnyanskaya is an 82-year-old SSI recipient who lives in Brooklyn, New York.

22.    Defendant Kilolo Kijakazi is the Acting Commissioner of Social Security, and as such is responsible for the administration of SSI. She maintains an office at 6401 Security Boulevard, Gwynn Oak, Maryland.

## FACTS CONCERNING SSA'S UNLAWFUL PRACTICES

*SSI Recipients and the COVID-19 Pandemic*

23.     The COVID-19 pandemic has had a devastating impact on Plaintiffs and the proposed plaintiff class, which includes low-income older adults and people with disabilities who receive SSI.

24.     The SSI program provides subsistence benefits for individuals with very low income, and who are also elderly or have significant disabilities. 42 U.S.C. §§ 1381, 1381a; 42 U.S.C. § 1382. "The basic purpose underlying the [SSI] program is to assure a minimum level of income for people who are age 65 or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level." 20 C.F.R. § 416.110.

25.     SSI recipients are, by definition, low income and either elderly or disabled, or both.

26.     People who are eligible for SSI are members of groups that have been the hardest hit by the COVID-19 pandemic. Adults 65 and older have been the most at risk of death from COVID-19 and have constituted almost 80% of COVID-19 deaths.[4] In addition, the risk of death from COVID-19 for persons with disabilities has been three times that of the general population.

27.     COVID-19 infection and death rates have disproportionately impacted communities of color, resulting in a death rate that is at least double that of white people. Older Black SSI recipients face a double jeopardy of risk due to their age and race.

28.     The ripple effect of COVID-19 on the economy and public spaces has impacted the ability of individuals with low income to meet their most basic needs. These individuals have

---

[4] *COVID-19 Mortality Overview*, Ctrs. for Disease Control & Prevention (last updated Sept. 8, 2021), https://www.cdc.gov/nchs/covid19/mortality-overview.htm (section "Death by Age Group," calculating that as of September 8, 2021, 78.1% of COVID-19 deaths in the U.S. were among people 65 years and older).

struggled through lockdowns, reduced public services, and limitations on business hours to maintain stable housing and avoid food insecurity. Many have struggled to secure even basic internet service. Thus, the ability of Plaintiffs and the proposed class to secure official documents, as well as to seek assistance and engage with public benefit agencies, including SSA, has been severely constrained by municipal, state, and federal efforts to control the spread of the virus, as well as their own reasonable fears of falling ill.

29.    The pandemic also has exacerbated anxiety and depression conditions, creating additional barriers for the plaintiff class in engaging with SSA. Since the onset of the pandemic, more than 41% of adults reported experiencing anxiety and depression, and 11% reported having suicidal thoughts. The Black and Latino communities have experienced depression and anxiety at even higher rates.

30.    In March 2020, in response to the pandemic, SSA closed its field offices, which had been a critical point of contact for many SSI recipients. In the preceding year alone, people visited SSA's field offices more than 43 million times to provide information concerning benefits, to seek assistance, to seek reconsideration, to appeal an action, or otherwise engage with the Agency.

31.    Aside from the closure of SSA field offices, Plaintiffs and the proposed class have been unable to invoke procedures to challenge SSA's overpayment determinations or to request waivers for alleged overpayments because they have not been properly informed of such procedures or the reasons for the purported overpayments.

32.    In other words, SSA's failure to adequately notify class members of their rights, combined with the daily challenges that low income, elderly, and disabled individuals face and the wide-scale response to the COVID-19 crisis, has made it impossible for the class members to

learn of, and to pursue, SSA's procedures for correcting errors that are leading to alleged overpayments and reductions of these recipients' SSI benefits. These hurdles continue due to the public health emergency and the fact that SSA's field offices remain closed.

33.    These circumstances have deprived needy SSI recipients of the basic subsistence benefits to which they are entitled and which they desperately need.

34.    Throughout the COVID-19 pandemic, SSI recipients have struggled to engage with the Agency and provide it with information. Many have been unable to do so. Since the Agency closed its doors in March 2020, the number of people receiving SSI has dropped by almost 300,000 individuals—even during this period of crisis across the community and tremendous need among low-income people.

35.    Class members depend on SSI benefits to cover their most basic needs for shelter, food, clothing, and medical care, which are all the more critical during a global pandemic. Without the full benefits to which they are entitled, they face a host of devastating harms, including homelessness, hunger, and the loss of critical Medicaid coverage linked to SSI.

*SSI Eligibility and the Waiver Process Before the COVID-19 Pandemic*

36.    SSI recipients are subject to strict income and resource tests that are set by statute. 42 U.S.C. § 1382.

37.    In 2021, a person living alone must have less than $2,000 in available resources to be eligible for SSI; two people living as a couple must have less than $3,000 in combined available resources. 20 C.F.R. § 416.1205(c).

38.    Likewise, an SSI recipient must have extremely low income—in general, the income limit for SSI is the federal benefit rate, which is $794 per month for an individual and $1,191 per month for a couple in 2021.

39.     For comparison, under federal law a single person living alone is still considered to be living in poverty if they receive substantially more than that—around $1,100 per month.

40.     Many changes in a person's circumstances affect their income, resources, or eligibility, and thus can impact the amount of SSI benefits they receive. These could include, among many others:  receiving earned or unearned income (including certain other government benefits), increased resources, direct and indirect financial assistance from family and friends, a change in residence, or a change in marital status.

41.     SSI recipients have a duty to report any changes in circumstances affecting their eligibility or impacting the amount of their monthly benefit within ten days of the end of the month in which the change occurred. 20 C.F.R. § 416.708. This requirement has not been waived or modified during the COVID-19 pandemic.

42.     Before the pandemic, millions of SSI recipients reported changes in their circumstances by visiting in person or calling their local field offices. Some also reported changes by faxing or mailing information to SSA. A limited number reported wage information using the SSI telephone wage reporting service or the mobile app.

43.     SSA discovers changes in SSI recipients' circumstances through other methods as well, including, but not limited to, data matching with government databases (like those maintained by the Department of Veterans Affairs) and non-governmental databases.

44.     SSA periodically reviews an SSI recipient's financial information to make sure that they remain eligible for benefits. During this "redetermination" process, SSA reviews the recipient's income, resources, and living arrangements to see if they are still eligible for SSI and are receiving the correct amount of benefits. Before March 2020, SSA used three methods to conduct redeterminations: in-person interviews, telephone interviews, or mailed forms.

45.    When SSA finds that a recipient is currently eligible for SSI but has exceeded the allowable SSI income or resource limits for one or more prior months, SSA determines that the recipient was overpaid for those month(s), sends a notice of overpayment ("Overpayment Notice"), and schedules the recoupment of benefits. 20 C.F.R. § 416.1336.

46.    The Overpayment Notice is required to inform the recipient of the correct and incorrect amounts for each overpaid month, the number of months covered by the overpayment, the reason for the overpayment, and the recipient's appeal rights (including the right to file for waiver of the alleged overpayment), among other information. 20 C.F.R. § 416.558.

47.    SSA initiates the overpayment process either by an SSA employee (manually) or through SSA's computer system (automatically). SSA does not notify recipients as to which process is used to initiate their recoupment.

48.    Typically, most types of overpayments are processed manually by SSA employees. Overpayments may be processed automatically when data from another government or private agency database shows that the recipient was ineligible for SSI benefits for a period of one or more months.

49.    To recoup allegedly overpaid funds, SSA reduces the recipient's benefits by 10% each month until the full balance of the overpayment is repaid. 20 C.F.R. § 416.570.

50.    A recipient who receives an Overpayment Notice may request a "waiver" from recoupment—that is, a decision by SSA to waive recoupment of the purported overpayment. 20 C.F.R. § 416.550. This "standard waiver" process existed long before the pandemic and applies to all overpayments.

51.    The standard waiver request may be filed at any time. POMS SI 02220.017.

52.     To request a standard waiver, a recipient must complete a Request for Waiver of Overpayment Recovery form called an "SSA-Form 632."

53.     Upon receipt of a standard waiver request, SSA is required to stop recoupment while the field office considers the waiver request. POMS SI 02260.001.

54.     Under the standard waiver process, SSA may waive an overpayment of benefits if the recipient can show: "(a) [t]he overpaid individual was without fault in connection with an overpayment, and (b) [a]djustment or recovery of such overpayment would: (1) [d]efeat the purpose of title XVI, or (2) [b]e against equity and good conscience, or (3) [i]mpede efficient or effective administration of title XVI due to the small amount involved." 20 C.F.R. § 416.550. *See also* 42 U.S.C. § 1383(b) and 20 C.F.R. §§ 416.552–554**.**

55.     Overpayment Notices summarize this standard, stating that the person must show that "it wasn't your fault that you got too much SSI money" and "paying us back would mean you can't pay your bills for food, clothing, housing, medical care or other necessary expenses or it would be unfair for some other reason."

56.     Congress has directed the Commissioner of Social Security to recover overpayments only under certain circumstances—where doing so would not "penalize[e] such individual or his eligible spouse who was without fault in connection with the overpayment" and where recovery of the overpayment would further the purposes of the program or not be "against equity and good conscience, or (because of the small amount involved) impede efficient or effective administration" of the program. 42 U.S.C. § 1383(b)(1).

57.     Notably, the standard waiver process is discretionary. Field office staff grant or deny waivers after engaging in a lengthy process, which includes reviewing the Form 632 and supporting documents and holding an in-person conference between a field office employee and

11

the recipient. During the pandemic, with field offices closed, SSA's process for considering standard waiver requests is unclear.

*Impact of COVID-19 on SSA's Operations and Recipients' Access to the Agency*

58.    In early 2020, the coronavirus disease known as COVID-19 spread widely throughout the world, including in the United States.

59.    On March 13, 2020, the President declared a COVID-19 National Emergency, which is ongoing.[5]

60.    On March 17, 2020, SSA closed its field offices across the country. These offices remain closed as of the date of this Complaint.

61.    SSA's closure of field offices has dramatically affected how recipients can inform SSA of their income, resources, and other changes relating to eligibility. There are limited alternative avenues for sharing this information, especially for the low-income, elderly, and disabled individuals who make up the SSI population.

62.    Because recipients cannot go to their local field offices to submit documentation required by SSA to establish their income, resources, and continued eligibility for benefits, many recipients have had to rely on the mail to send information to SSA.

63.    Mail has not been reliably delivered by the U.S. Postal Service during much of this period.[6] Even worse, mail has not been reliably or timely opened or processed by SSA because

---

[5]    https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/.    HHS issued a COVID-19 Public Health Emergency:    https://www.jdsupra.com/legalnews/hhs-renews-covid-19-public-health-7460982/.

[6]    S. Comm. on Homeland Sec. & Governmental Affs., USPS Oversight Update (Dec. 18, 2020), at 1-3, https://www.hsgac.senate.gov/imo/media/doc/201218_OversightUpdate_PetersPostal.pdf (describing "widespread delays" and "compromised mail service" throughout U.S. Postal Service system in the second half of 2020). Pervasive delays and inconsistent delivery remain ongoing. *See, e.g.*, *A Hearing to Review the FY 2022 Budget Request for the USPS Office of Inspector General and USPS Service Issues: Hearing Before the Subcomm. on Fin.*

the majority of SSA staff are working remotely and field offices remain closed. An interim report released by the Office of Inspector General on July 29, 2021 found that half of field office managers reported being overwhelmed by mail duties, and 20 percent stated they are unable to keep up with processing mail.[7]

64.    Individuals can fax information to SSA, but many SSI recipients do not have access to a fax machine or cannot afford the fees to use one. Additionally, many stores and public libraries with fax services have been closed during the pandemic.

65.    From March to September 2020, SSA stopped manually processing all terminations, suspensions, and overpayments, as the Agency determined how their employees could conduct these workloads in a remote, telework environment.

66.    Similarly, from March to September 2020, SSA also paused redeterminations. Pausing redeterminations has cut off yet another usual avenue of reporting of changes impacting benefit amounts for SSI recipients.

67.    From March to September 2020, even where recipients were able to transmit information to SSA that would have led to an overpayment of benefits during the normal course of business, SSA did not act on the overpayment. In other words, in many cases, SSA was aware of information that would have led to a change in benefit amount, but did not take timely action due to SSA's unilateral decision to pause work.

68.    As a result of this workload pause, when SSA did later seek to recover overpayments, the period covered by the overpayment was longer due to no fault of the recipient.

---

*Servs. & Gen. Gov't of the S. Comm. on Appropriations*, 117th Cong. (July 13, 2021), https://www.uspsoig.gov/sites/default/files/document-library-files/2021/USPS%20OIG%20Written%20Statement%20-%20FSGG.pdf (statement of Tammy L. Whitcomb, Inspector Gen., U.S. Postal Serv.) (admitting ongoing "broad service issues" and delivery delays).
[7] *The Social Security Administration's Processing of Mail and Enumeration During the COVID-19 Pandemic*, https://oig-files.ssa.gov/audits/full/A-08-21-51036InterimReport.pdf.

This has unfairly led to overpayment amounts greater than they would otherwise have been during the normal course of business, had SSA timely processed the information in its possession.

*SSA's Efforts to Address Harm to Recipients Resulted in the Flawed Interim Final Rule*

69.    On August 27, 2020, SSA issued the IFR, 85 Fed. Reg. 52,909. SSA recognized that certain "overpayment debts . . . occurred because of the circumstances surrounding the COVID-19 national public health emergency."

70.    The IFR states:  "The combination of the pandemic and our necessary response to it has created a set of circumstances unlike any other in the history of our programs. This unique situation affects a number of our beneficiaries and, more importantly, affects them in a uniformly detrimental manner primarily due to our reprioritizing workloads to suspend the manual processing of certain actions." *Id.* at 52,910.

71.    The IFR "assume[s] that these debts are not the fault of the affected beneficiaries due directly to our strategic decision to reprioritize workloads to stop manually processing certain actions, and it would be against equity and good conscience to collect them." *Id.* at 52,909. One of the goals of the rule was to "ensur[e] that affected beneficiaries are not disadvantaged by [SSA's] actions during this unprecedented national public health emergency." *Id.*

72.    The IFR purports to create a "simplified waiver process," which provides two key benefits for beneficiaries with overpayment debts that fell within the rule's purview. *Id.* at 52,910.

73.    First, the IFR provides that SSA "will presume overpaid individuals are without fault in having caused the qualifying overpayment debt" and "will determine that recovery of . . . qualifying overpayment debt incurred during the pandemic period would be against equity and good conscience." *Id.* at 52,910. As a result, SSA "will waive recovery of the portion of qualifying

overpayment debt incurred during the pandemic period." Thus, nearly all[8] recipients who request waivers of overpayment debts covered by the IFR would be entitled to a waiver of recoupment.

74.     Second, the IFR requires that the field offices use a "streamlined process" to accept requests for waiver to "more efficiently administratively process qualifying overpayment debts and provide relief in a timely fashion." *Id.* at 52,910. Under the "streamlined process," persons entitled to the waiver are "not [ ] required to complete the full form SSA–632 or provide supporting information about his or her income and expenses to make the waiver determination for the qualified debt." *Id.* at 52,911.

75.     The IFR defines a "qualifying overpayment" as one that:  (1) accrued because of SSA's suspension of certain manual workloads that would otherwise have identified and taken action on the overpayment; (2) accrued at any point between March 1, 2020 and September 30, 2020 (SSA's so-called "pandemic period"); (3) SSA identified by December 31, 2020; and (4) the beneficiary requested a waiver of the overpayment. *Id.* at 52,910.

76.     Notwithstanding the IFR's stated broad objectives, it contains at least five arbitrary and capricious limitations, each of which has the result of excluding overpayments caused directly or indirectly by the pandemic.

77.     *First*, the IFR applies only to overpayments that would typically be identified through SSA's "manual process" and not "overpayment debts that [SSA] identified through [its] automated processes." *Id.* at 52, 910.

---

[8] The IFR established a *presumption* that beneficiaries were without fault, and stated that SSA would "not fully develop the issue of fault, the IFR maintained a "limited exclusion[] . . . for overpayment debts that resulted from fraud or similar fault or misuse of benefits by a representative payee." 85 Fed. Reg. at 52,912.

78.    This means—as the IFR itself acknowledged—that "even if beneficiaries incurred the debts during the [same] period and in the same manner," *id.* at 52, 910, some would be eligible for the benefits of the rule, while others would not.

79.    Notably, recipients have no control over whether SSA will review their eligibility through a "manual" or "automated" process. Moreover, an individual receiving notice of an overpayment would have no way of knowing whether the overpayment was processed manually or automatically because SSA does not provide that information.

80.    *Second*, the IFR only applies to overpayments incurred during a limited period, from March to September 2020, which the IFR termed the "pandemic period." *Id.* at 52,909 n.1.

81.    Notably, this period is closed-ended. It does not align with the President's declaration of the COVID-19 National Emergency (which is still ongoing). It does not align with other guidance more recently issued by SSA about SSI eligibility, which defines the disaster end date to align with the end of the Federal Emergency Management Agency (FEMA)-specified incident period which, for all fifty states, began in March 2020 and remains ongoing.[9]

82.    The pandemic period for unemployment purposes has different end dates depending on the state, territory, or tribal area. The earliest "Pandemic UIB End date" anywhere was in June 2021. In many places, including New York, the pandemic period for unemployment purposes is still ongoing as of the date of this filing. *See* EM-21050(B)(4).

83.    The IFR's so-called "pandemic period" ended on September 30, 2020, when the United States' total COVID-19-related deaths were approximately 4,000 per week. In the

---

[9] *See* EM 21050, July 23, 2021, https://secure.ssa.gov/apps10/reference.nsf/lnx/07232021011154PM#B4, "As of the publication date of this EM, the disaster declaration remains in effect in all States, five territories, and 32 Tribal areas."

subsequent months, after the IFR's "pandemic period," COVID-19 deaths skyrocketed, to as high as 25,000 per week.[10]

84.     Well after the end of the "pandemic period" on September 30, 2020, SSA kept its field offices closed because of risks from COVID-19. The field offices still have not reopened.

85.     *Third*, the IFR further limits when a qualifying overpayment occurring during the so-called "pandemic period" had to be *discovered* by SSA. Specifically, only overpayment debts that SSA "identified" by December 31, 2020 fall within the purview of the IFR—even if they otherwise meet all relevant criteria. *Id.* at 52,909.

86.     In other words, two recipients with identical overpayments, incurred in the same month, could receive different treatment under the IFR based on when SSA discovered the overpayment. The recipient whose overpayment was identified on December 31, 2020 would benefit from the streamlined waiver process. The recipient whose overpayment was discovered the very next day, on January 1, 2021, would not.

87.     Because field offices were closed (and remain closed to this day), only skeleton staff have been working out of the offices in person.

88.     Recipients have no control over when SSA will identify an overpayment.

89.     *Fourth*, the IFR is limited to overpayments that SSA identified but did not act on during the pandemic period because of the workload pause. It does not extend to overpayments that arose when recipients were unable to submit information about changes in their circumstances to SSA and to have it timely processed by SSA, as a direct result of pandemic conditions.

---

[10] Centers for Disease Control and Prevention, Provisional Death Counts for Coronavirus Disease 2019 (COVID-19), Daily Updates of Totals by Week and State, *available at* https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm.

90.     For instance, the IFR does not provide relief for an SSI recipient who had an overpayment due to a small monetary gift received during the pandemic if they were unable to submit proof of the gift to SSA because their local field office was closed, they did not have a fax machine in their home, and they were unable to safely leave their home to find a publicly available fax machine or to visit USPS (further exacerbated by mandated lockdowns and office closures). Because SSA was not aware of the change in circumstance, this overpayment would not have been identified by SSA and would not be covered by the IFR. Yet, the overpayment clearly arose as the result of pandemic conditions, including the closure of SSA's field offices.

91.     *Finally,* and critically, the IFR does not provide for an automatic waiver; instead, it requires individuals to affirmatively request such streamlined waivers, even though they have not been adequately notified that the streamlined waiver exists and requests, when made, are not timely or adequately granted by SSA.

92.     To obtain the streamlined waiver, each recipient had to receive the notice of overpayment, understand its contents, determine how to apply for and request a streamlined waiver, reach SSA by phone, and reach an SSA worker familiar with the IFR and the streamlined waiver process who was willing to accept and process the waiver—all while the SSA's field offices remained (and remain) closed. Notably, as described further below, the notices sent to recipients failed to inform them that a new no-fault streamlined waiver process had been established or that their local field offices were closed.

93.     This is true notwithstanding that SSA has in its own records all of the information necessary to identify which SSI recipients had "qualifying overpayments" for purposes of the IFR.

94.     As described in more detail below, the Overpayment Notices did not explain how to request a no-fault streamlined waiver and the IFR does not require the Overpayment Notices to contain any such explanation.

95.     As a result, many people eligible for a no-fault streamlined waiver under the IFR did not receive it. Despite admitting in the IFR that the fault for the overpayment did not lie with the recipient, SSA's requirement that the recipient file a waiver request places the onus on the elderly or disabled recipient to take action to obtain relief. As pandemic conditions continued into October 2020 and beyond, access to SSA to request a no-fault streamlined waiver remained restricted for this population. SSA did not make the no-fault streamlined waiver automatic for overpayments identified by SSA that were already found to meet all the other requirements of the IFR even though the Agency determined that such an overpayment meets the requirements for waiver (i.e., not the fault of the recipient and against equity and good conscience).

96.     SSA issued the IFR and made it effective on publication, and also provided a 60-day comment period.

97.     Many organizations and advocates submitted comments to the IFR that noted deficiencies and flaws in the rule.[11] Importantly, almost every organization that provided comments suggested extending the pandemic period beyond September 30, 2020.

98.     Many commenters also suggested extending the SSA identification period for overpayments past December 31, 2020.

99.     Some commenters observed that the types of overpayments covered by the IFR were unduly limited, and suggested expanding the use of the no-fault streamlined process to all overpayments that resulted from the closure of SSA offices and transition to remote work.

---

[11] https://www.regulations.gov/document/SSA-2020-0045-0001/comment

100.    Many commenters noted that it was unfair for SSA to require individuals to apply for waivers under these circumstances, and that SSA should instead grant automatic waivers.

101.    Notwithstanding the extensive comments noting the IFR's deficiencies in myriad ways, SSA failed to revise the Rule or issue further guidance that would address these deficiencies.

*SSA's Implementation of the IFR*

102.    SSA has failed to implement the IFR in a number of ways.

103.    SSA has regularly refused to allow recipients to submit streamlined waiver requests by telephone.

104.    SSA has regularly told individuals who requested a streamlined waiver that their overpayment was not a qualifying overpayment without explaining what criteria it failed to meet.

105.    Notwithstanding that the IFR specifies that recipients need not fill out the standard waiver form (SSA-632) to submit a waiver request, SSA has regularly required recipients requesting a streamlined waiver for an overpayment that arose during the "pandemic period" under the IFR to submit that form.

106.    When a request for a streamlined waiver under the IFR has been made by phone, but not processed on the same day, SSA has failed to stop recoupment pending the outcome of the waiver request.

107.    Upon information and belief, SSA has no method or process for tracking requests for streamlined waivers under the IFR that are made by phone, but not granted on the same day.

108.    SSA issued an Emergency Message, EM-20037 SEN, effective August 31, 2020, and then issued a revised version of the Emergency Message, EM-20037 SEN REV, effective

November 19, 2020 ("EM"). An Emergency Message provides SSA staff with instructions on how to implement SSA policies.

109.    The EM drastically curtailed the overpayment debts to which the IFR would be applied, even beyond the limited categories already set forth in the IFR itself.

110.    Specifically, the EM limited the IFR's protections to overpayments that were coded in a particular way in SSA's computer system—those that contained the code "CV19" or "318" in certain fields.

111.    The IFR, as published, did not reference or require these specific codes for an overpayment to be eligible for the rule's benefits.

112.    Adding this requirement thereby limited the pool of recipients eligible for the streamlined waiver to those for which SSA staff actually entered a particular code into SSA's computer system, excluding individuals who were otherwise eligible, but whose electronic files had not been properly annotated.

113.    Notably, recipients have *no* control over whether SSA will enter a particular code on their account.

114.    SSA regularly fails to code actions accurately, or in fact, to code them at all. SSA staff were transitioning to remote work during this time and learning to navigate SSA's systems from home. As a result, many eligible overpayments were not coded as such by SSA staff.

115.    Advocates, including NYLAG, have requested information about the parameters required for a case record to receive the appropriate code, who decided whether a code should be applied to the record, when the code was applied, and who applied the code. SSA has not provided that information.

116.    SSA has since revised the Emergency Message twice, EM-20037 SEN REV 2, effective March 16, 2021, and EM-20037 SEN REV 3, effective June 25, 2021 and currently in effect ("Revised EM").

117.    In sum and substance, ten months after the IFR was published and six months after overpayments were supposed to be identified by the SSA to be eligible for a streamlined waiver, the Revised EM provided background information, clarified instructions, and gave examples of various different scenarios and how to handle them. For example, it provided directions and examples of how technicians should handle waiver requests for overpayments that fell both inside and outside the "pandemic period" (called "split waivers").

118.    The Revised EM provided guidance on how overpayments could qualify for the IFR's streamlined waiver process even if they did not have the "CV19" or "318" codes. It provided complicated instructions for identifying multiple other locations within SSA's computer system that relevant coding could be discovered.

119.    However, even after the Revised EM was issued, SSA staff were unlikely to correctly identify eligible overpayments because they were directed to look in many different places to try to identify the relevant information.

120.    Moreover, after issuing the Revised EM, SSA did not instruct its employees to re-review accounts that had previously been reviewed, to determine whether certain recipients who previously requested waivers were actually eligible for the IFR's streamlined waiver process.

*SSA's Overpayment Notices*

121.    Following publication of the IFR, SSA modified its Overpayment Notices.

122.    The Overpayment Notices, as revised, contain a "SPECIAL MESSAGE FOR OVERPAYMENTS BETWEEN MARCH AND SEPTEMBER 2020," which indicate:

> We [are] temporarily suspending processing and collection of some overpayments between March and September 2020. We did this because of the national public health emergency caused by the coronavirus (COVID-19) pandemic. If you were overpaid between March and September 2020, you may request a waiver, and we may find that you do not have to repay some or all of the overpayment. Please contact your local Social Security office by phone to request a waiver. You can find the telephone number for your local office below in this letter.

123.    The Overpayment Notices also contained standard language that was the same as language included in the pre-pandemic Notices, including the following:

- "For us to waive the collection of the overpayment, two things have to be true:  It wasn't your fault that you got too much SSI money <u>AND</u> Paying us back would mean that you can't pay your bills for food, clothing, housing, medical care or other necessary expenses, or it would be unfair for some other reason."

- "You can ask for waiver at any time by completing the waiver form and returning it to us. The form is called 'Request for Waiver of Recovery or Change in Repayment Rate,'" Form SSA-632.

- "If you have any questions, please: . . . . Write or visit any Social Security office. If you plan to visit an office, you may call ahead to make an appointment. The office that serves your areas is located at:  [address]. Please have this letter with you if you call or visit an office."

124.    The Notices failed to adequately inform recipients of their rights and were seriously flawed in at least four ways.

125.    First, the Notices failed to inform recipients that SSA was applying a presumption that recipients were not at fault in causing any overpayments covered by the IFR.

126.    To the contrary, the Notices indicated that it "ha[d] to be true" that "[i]t wasn't your fault that you got too much SSI money."

127.    The natural result of falsely stating that fault-based criteria applied was that recipients would believe they needed to affirmatively establish that they were not at fault in order to receive a waiver, and thus would be discouraged from seeking such a waiver.

128.    Second, the Notices failed to inform recipients that SSA had determined that recovery of any overpayment debt covered by the IFR would be against equity and good conscience.

129.    To the contrary, the Notices indicated that it "ha[d] to be true" that "[p]aying us back would mean that you can't pay your bills for food, clothing, housing, medical care or other necessary expenses, or it would be unfair for some other reason."

130.    This statement was false because there was no requirement that recipients face financial difficulties in paying back the overpayment.[12]

131.    Third, the Notices did not inform recipients that SSA field offices were closed, and did not inform recipients how those closures affected their ability to interact with SSA.

132.    To the contrary, the Notices specifically directed recipients to "visit any Social Security office" and provided the address of their local field office.

133.    Fourth, for overpayments covered by the IFR, the Notices failed to explain that recipients would not be required to complete the full Form SSA–632 or provide supporting information about their income and expenses.

134.    To the contrary, the Notices specifically directed recipients to "ask for waiver at any time by completing the waiver form and returning it to us. The form is called "Request for Waiver of Recovery or Change in Repayment Rate," Form SSA-632."

---

[12] A determination was made that recovery of any overpayment debt falling within the purview of the IFR would be against equity and good conscience. *Supra* ¶¶ 68, 71.

## FACTS CONCERNING NAMED PLAINTIFFS

***LaQuana Campos, on behalf of herself and her minor child, K.C.***

135.    LaQuana Campos is a 36-year-old who resides in Fort Greene, Brooklyn. Ms. Campos lives with her husband ("Mr. Campos"), her 14-year-old child, K.C, and two other children.

136.    Ms. Campos and K.C. each receive SSI benefits. Ms. Campos uses these benefits to pay for their monthly expenses, including a portion of the household's rent and food.

137.    All documents from SSA regarding K.C.'s benefits are sent to Ms. Campos "for" K.C., as Ms. Campos serves as K.C.'s representative payee.

138.    Prior to the COVID-19 pandemic, Ms. Campos completed all of her interactions with SSA regarding her SSI benefits and K.C.'s SSI benefits in person, at the SSA field office.

139.    At the start of the COVID-19 pandemic, Mr. Campos lost his job setting up large events. Mr. Campos began to receive unemployment benefits, both from the state and the federal government. Mr. Campos was able to work a few days in the Fall 2020, but did not begin to work again regularly until August 2021—over a year into the pandemic.

140.    For most of 2020, the family's only source of income was Mr. Campos's unemployment benefits and Ms. Campos's and K.C.'s SSI benefits.

141.    The family also lost their Supplemental Nutrition Assistance Program (SNAP) benefits during the pandemic.

142.    At the beginning of the COVID-19 pandemic, Ms. Campos, K.C., and the rest of their family of five were all locked down together in their apartment.

143.    During this time, Ms. Campos had a hard time finding food to feed her family, as many food pantries were closed and their family had minimal funds to live on.

144.    This time period took a serious toll on Ms. Campos's physical and mental health.

145.    Ms. Campos is at high risk for COVID-19 due to underlying health conditions. Due to these health conditions, Ms. Campos has been hospitalized multiple times during the pandemic.

146.    Ms. Campos did not report Mr. Campos's unemployment benefits to SSA because she knew that SSA field offices were closed and was not aware of any other way to report the benefits.

147.    Later, Ms. Campos tried to gather documents relating to Mr. Campos's unemployment. The process of tracking down the documents that she needed to submit was extremely difficult for her, because Mr. Campos's entire office was closed due to COVID-19.

148.    On or about September 9, 2020, SSA sent K.C. an Overpayment Notice. The Overpayment Notice stated that K.C. was paid $783 in July, August, and September 2020—but that in each of these months she should have been paid $0 because her other income increased.

149.    On September 9, 2020, SSA sent K.C. a Notice of Planned Action stating that her benefits would be reduced from $783 to $32.50 starting in October 2020 because "her other income increased."

150.    On information and belief, the increase in income referred to by SSA in these notices was Mr. Campos's unemployment benefits, as that was the family's primary income source at the time.

151.    Shortly thereafter, Ms. Campos sought the assistance of NYLAG.

152.    On October 2, 2020, NYLAG filed a request for reconsideration on behalf of K.C. The request explained that Mr. Campos was "only receiving $182/week in unemployment" and

was "no longer receiving" federal unemployment benefits, and that Ms. Campos was "only receiving SSI."

153.    On October 16, 2020, SSA sent K.C. a second Notice, stating that her payments for July, September, and October 2020 were being "increased" to their original amount, $783. In other words, SSA was no longer considering July and September 2020 to be overpayments. The Notice also stated that K.C. was owed a back payment of $750.50 (the $783 she was due for October, less the $32.50 she had already been paid for October). This Notice did not affect her August 2020 payment (which was still an overpayment of $783).

154.    This second Notice further stated that K.C. would be receiving only $355.25 in SSI in November 2020 due to extra income in September 2020.

155.    On October 27, 2020, SSA sent Ms. Campos an Overpayment Notice. This Overpayment Notice stated that Ms. Campos was overpaid a total of $3,132. Specifically, it said that she was paid $783 in April, May, June, and September 2020—but that in each of these months, she should have been paid $0 because of her "spouse's gifts, prizes, cash or special income." During this period, Mr. Campos's unemployment benefit was the family's primary source of income.

156.    On October 29, 2020, SSA sent K.C. a third Notice, stating that her SSI benefits would be terminated beginning in December 2020 "because her other income increased." During this time, Mr. Campos's unemployment benefit was the family's primary source of income.

157.    In November 2020, Ms. Campos received a Notice stating that, due to the termination of her SSI benefits, K.C.'s Medicaid benefits would also be terminated. Ms. Campos panicked, because health care is very expensive and K.C. needs various services, such as physical therapy, that are paid for via Medicaid.

158.    In November 2020, NYLAG advocated on K.C.'s behalf and explained to SSA that Mr. Campos was receiving only $182 per week in unemployment income, and extremely limited income from work. SSA reversed the termination. As a result, K.C.'s Medicaid termination was also reversed.

159.    On November 24, 2020, NYLAG asked an SSA representative how to request a streamlined waiver. The representative said that, to her knowledge, a standard waiver form (Form 632) had to be filed, but directed NYLAG to call another SSA representative for more information.

160.    On November 25, 2020, NYLAG called that representative, but he did not answer the phone and there was no option to leave a voicemail. NYLAG called the local SSA field office to ask how to request a streamlined waiver for K.C. and Ms. Campos. The SSA representative said that NYLAG could seek to make an appointment to request the waiver, but that in fact no appointments were available. The SSA representative said that when an appointment became available, Ms. Campos and K.C. would get a letter in the mail stating so.

161.    NYLAG asked whether there was any way to expedite the request for a streamlined waiver. The representative said that NYLAG could submit the standard waiver form (Form 632) on behalf of K.C. and Ms. Campos.

162.    On November 30, 2020, NYLAG submitted a letter on K.C.'s behalf, requesting a streamlined waiver for K.C.'s August 2020 overpayment (identified in the letter dated September 9, 2020). The written request included a cover letter and a copy of the IFR.

163.    On November 30, 2020, NYLAG also submitted a letter on behalf of Ms. Campos requesting a streamlined waiver for Ms. Campos's April, May, June, and September 2020

overpayment (identified in the letter dated October 27, 2020). The written request included a cover letter and a copy of the IFR.

164.    Ms. Campos received no acknowledgement of her and K.C.'s requests for waiver from SSA and does not know whether either or both streamlined waiver requests were ever acted upon by SSA.

165.    In December 2020, Ms. Campos was able to find a job as a receptionist and began working.

166.    Shortly after she began working, Ms. Campos submitted documentation of income from her new job to SSA via fax. She never received any confirmation that SSA received these documents.

167.    On March 9, 2021, SSA sent K.C. a third Overpayment Notice. This Overpayment Notice stated that K.C. was overpaid $1,416.48 in June through November 2020 because SSA "didn't know about" certain income. Ms. Campos does not know what income this is referring to. The notice stated that SSA would begin a monthly recoupment of $79.40 in June 2021 until the overpayment is paid back.

168.    On March 9, 2021, SSA sent Ms. Campos a second Overpayment Notice. The Overpayment Notice stated that Ms. Campos was overpaid $4,698 in April through August 2020 because SSA "didn't know about" certain income. Again, Ms. Campos does not know what income this is referring to. The notice stated that SSA would begin a monthly recoupment of $79.40 in June 2021 until the overpayment is paid back.

169.    On May 1, 2021, SSA sent Ms. Campos a second Notice stating that her June 2021 payment was being reduced from $794 to $714.60, because 10% of her benefits were being recouped due to the overpayment.

170.    On May 4, 2021, SSA sent Ms. Campos a third Notice stating that her payments from October 2020 through the present were being reduced due to an increase in her income.

171.    On May 26, 2021, SSA sent Ms. Campos a third Overpayment Notice, which stated that Ms. Campos was overpaid a total of $1,129. Specifically, it said that in each month from October to December 2020 Ms. Campos was paid $783, in each month from January to May 2021 Ms. Campos was paid $794—but that in the 2020 months she should have been paid $641.84 and in the 2021 months she should have been paid $652.84 because her "income on [SSA] records was wrong."

172.    On August 16, 2021, SSA sent Ms. Campos a fourth Notice, called a Notice of Change in Payment, stating that her payments from October 2020 to December 2020 were being increased from $641.84 to $783, and that her payments from April to August 2020 were being increased from $652.84 to $794 because her "other income decreased." But the notice also stated that her payments from January to March 2021 were being decreased from $794 to $0 because her "other income increased." On information and belief, the 2021 reduction was due to Ms. Campos becoming employed in December 2020. Ms. Campos had faxed records showing her employment to SSA months prior.

173.    On August 26, 2021, SSA sent Ms. Campos a fourth Overpayment Notice. This Overpayment Notice stated that Ms. Campos was overpaid $970.40 in January, February, and March 2021. The Overpayment Notice further stated that "[t]his new overpayment is in addition to the old overpayment of $10,535.45 already on your record." On information and belief, this 2021 overpayment was due to Ms. Campos becoming employed in December 2020.

174.    On information and belief, the September 9, October 27, March 9, May 26, and August 26 Overpayment Notices all contained the "SPECIAL MESSAGE FOR

OVERPAYMENTS BETWEEN MARCH AND SEPTEMBER 2020" quoted above at ¶¶ 122-23, including the following:

- "For us to waive the collection of the overpayment, two things have to be true:  It wasn't your fault that you got too much SSI money AND Paying us back would mean that you can't pay your bills for food, clothing, housing, medical care or other necessary expenses, or it would be unfair for some other reason."

- "You can ask for waiver at any time by completing the waiver form and returning it to us. The form is called 'Request for Waiver of Recovery or Change in Repayment Rate,' Form SSA-632."

- "If you have any questions, please: . . . . Write or visit any Social Security office. If you plan to visit an office, you may call ahead to make an appointment. The office that serves your areas is located at:   SOCIAL SECURITY ADMINI, 7TH FLOOR, 195 MONTAGUE ST, BROOKLYN NY 11201. Please have this letter with you if you call or visit an office."

175.    On information and belief, at least some of Ms. Campos's and K.C.'s overpayments were due to SSA improperly counting Mr. Campos's pandemic-related unemployment benefits as income.

176.    SSA's current policy is that SSA will exclude all regular and pandemic unemployment from income and resources during the pandemic period. *See* EM-21050, EM-20014 REV 3. The pandemic period for unemployment purposes has different end dates depending on the state, territory, or tribal area. The earliest "Pandemic UIB End date" anywhere was in June 2021. In many places, including New York, the pandemic period for unemployment purposes is still ongoing as of the date of this filing. *See* EM-21050(B)(4).

177.    The effect of these errors is that, on information and belief, Ms. Campos and K.C. were wrongly assessed overpayments and K.C. wrongly had her benefits terminated.

178.    No one from SSA ever informed Ms. Campos that she or K.C. may be eligible for a streamlined waiver, or how to request one.

179.    Ms. Campos did not know (and could not have known) whether her and K.C.'s overpayments were processed manually or automatically.

180.    Ms. Campos did not know (and could not have known) for certain the date on which her and K.C.'s overpayments were identified by SSA.

181.    On information and belief, some or all of Ms. Campos's and K.C.'s overpayments are eligible for the streamlined waiver under the IFR.

182.    On information and belief, some of Ms. Campos's and K.C.'s overpayments were not eligible for the streamlined waiver under the IFR because they were identified by SSA after December 31, 2020. Specifically, SSA notified Ms. Campos and K.C. of certain overpayments in March, May, and August 2021, suggesting that it may not have identified their entire overpayments until some point in early- or mid-2021.

183.    On information and belief, Ms. Campos's and K.C.'s full overpayments for April to September 2020 would have been eligible for the streamlined waiver under the IFR if SSA had identified them all on or before December 31, 2021.

184.    K.C.'s overpayment for October and November 2020 and Ms. Campos's overpayment from October 2020 to March 2021 are not eligible for the streamlined waiver under the IFR because the IFR extends only to overpayments incurred through September 2020.

185.    On information and belief, all K.C.'s and Ms. Campos's overpayments would have been eligible for the streamlined waiver under the IFR if SSA had extended the IFR to cover the full period of the COVID-19 National Emergency.

186.    On information and belief, Ms. Campos and K.C.'s benefits were reduced by $79.40 monthly in June and July 2021 for recoupment of the overpayments that they received notices for in March 2021.

187.    Ms. Campos and K.C. have suffered harm from SSA's actions. Ms. Campos fell behind on the family's cable and phone bills. Ms. Campos's phone service was cut off, causing her to worry that her children would be unable to reach her in case of an emergency. The family also had only limited money for food, and it was stressful to feed everyone. During the months Ms. Campos's benefits were reduced due to the recoupment, Ms. Campos felt that the family budget was stressed beyond what was possible.

188.    Ms. Campos had extreme stress, including panic attacks, from the barrage of notices from SSA. Ms. Campos struggled to provide food, clothing, and shelter for her family. Her stress contributed to her physical health problems, resulting in multiple hospitalizations.

***Tosha Adams***

189.    Tosha Adams is a 60-year-old who resides in East New York, Brooklyn. She lives with two minor children whom she adopted from foster care.

190.    Until December 2020, Ms. Adams received income from SSI. She used her SSI benefits to pay for her own monthly expenses, including her rent, food, and utilities.

191.    Ms. Adams receives approximately $2,700 in a monthly Adoption Assistance subsidy from the Administration for Children's Services to cover costs associated with the children. Ms. Adams has received this subsidy each month for years. Because these funds are designated for the children, Ms. Adams uses the adoption subsidy funds only for expenses related to the children and does not use these funds for her own expenses, even necessary ones like her own food or healthcare.

192.    Prior to the COVID-19 pandemic, Ms. Adams completed all of her interactions with SSA regarding her SSI benefits in person, at the SSA field office.

193.    At the start of the COVID-19 pandemic, Ms. Adams and the two children were locked down together in their apartment. The children's schools were closed and they were learning remotely. Since they rarely left the apartment, necessary expenses for the children decreased.

194.    During this time, Ms. Adams did not spend as much of the adoption subsidy as she did in a normal month prior to the pandemic, because the children's costs decreased. Ms. Adams was careful with the children's funds and did not want to spend their money unnecessarily.

195.    This time period took a serious toll on Ms. Adams's physical and mental health.

196.    Ms. Adams is at high risk for COVID-19 due to underlying health conditions. Due to these health conditions, Ms. Adams has been hospitalized multiple times during the pandemic.

197.    Because Ms. Adams had been receiving the children's adoption subsidy for years, she did not think that it affected her SSI and did not report it to SSA.

198.    On or about November 16, 2020, SSA sent Ms. Adams an Overpayment Notice. On information and belief, this Overpayment Notice stated that Ms. Adams was paid $783 in each month from March to November 2020—but that in each of these months, she should have been paid $0 because she was over the $2,000 resource limit.[13]

199.    On information and belief, this Overpayment Notice contained the "SPECIAL MESSAGE FOR OVERPAYMENTS BETWEEN MARCH AND SEPTEMBER 2020" quoted above at ¶¶ 122-23, including the following:

- "For us to waive the collection of the overpayment, two things have to be true:  It wasn't your fault that you got too much SSI money <u>AND</u> Paying us back would mean that you can't pay your bills for food, clothing, housing, medical care or other necessary expenses, or it would be unfair for some other reason."

---

[13] On information and belief, the Overpayment Notice also stated that Ms. Adams had an overpayment for months prior to March 2020, going back to late 2018.

- "You can ask for waiver at any time by completing the waiver form and returning it to us. The form is called 'Request for Waiver of Recovery or Change in Repayment Rate,' Form SSA-632."

- "If you have any questions, please: . . . . Write or visit any Social Security office. If you plan to visit an office, you may call ahead to make an appointment. The office that serves your areas is located at:  SOCIAL SECURITY, 1540 FULTON STREET, BROOKLYN NY 11216. Please have this letter with you if you call or visit an office."

200.    On November 16, 2020, SSA sent Ms. Adams a Notice of Planned Action that stated that Ms. Adams's SSI payments would be terminated beginning in December 2020 because she had "countable resources worth more than $2,000.00."

201.    SSA's policy is that adoption assistance funds of the type Ms. Adams receives are considered income to the children, and do not count as income or resources for Ms. Adams for the purposes of SSI eligibility. *See* POMS SI 01320.001 and SI 00830.415.

202.    In other words, adoption assistance funds received by Ms. Adams should not have been counted toward her allowable assets.

203.    On information and belief, Ms. Adams's overpayment stemmed from excess adoption subsidy funds that accrued over many months. On information and belief, the accrual of these adoption subsidies had a cascading effect, so that in each month, that month's adoption subsidy, as well as prior months' adoption subsidies, were improperly counted as Ms. Adams's resources.

204.    The Notice showed that between March and April 2020, for example, Ms. Adams's resources increased by approximately $1,700—much less than the nearly $2,800 monthly adoption subsidy that she received.

205.    The effect of this error is that, on information and belief, Ms. Adams was wrongly assessed an overpayment and wrongly had her benefits terminated when in fact she remained eligible for SSI and met all applicable SSA requirements.

206.    On December 30, 2020, Ms. Adams called the number listed on the Overpayment Notice and requested a waiver *pro se*. She later had a phone appointment regarding the waiver. On information and belief, her waiver request was denied.

207.    No one from SSA ever informed Ms. Adams that she may be eligible for a streamlined waiver under the IFR for this overpayment.

208.    Ms. Adams did not know (and could not have known) whether her overpayment was processed manually or automatically.

209.    Ms. Adams did not know (and could not have known) the date on which her overpayment was identified by SSA.

210.    On information and belief, Ms. Adams's overpayment for the months of March through September 2020 is eligible for the streamlined waiver under the IFR.

211.    Ms. Adams's overpayment for October and November 2020 is not eligible for the streamlined waiver under the IFR because the IFR extends only to overpayments incurred through September 2020.

212.    On information and belief, Ms. Adams's entire overpayment would have been eligible for the streamlined waiver under the IFR if SSA had extended the IFR to cover the full period of the COVID-19 National Emergency.

213.    On or around November 2020, Ms. Adams received a notice from the New York City Human Resources Administration stating that, due to the termination of her SSI benefits, her Medicaid benefits would also be terminated. Ms. Adams panicked, because she relies on services from a home health aide that are paid for via Medicaid. Ms. Adams immediately called the number on the notice and was able to stop the scheduled termination of her Medicaid benefits.

214.    While the SSA field offices were closed, it was much more difficult for Ms. Adams to submit documents to SSA than it had been previously. Ms. Adams attempted to mail and fax many different documents to SSA, but, based on later conversations with SSA representatives, believes that most of them were not received. Each time she needed to fax a document, she had to go to a local copy shop and pay to use the fax machine. Ms. Adams often had to borrow money just to afford the fee to send a fax to SSA.

215.    Ms. Adams found it almost impossible to work effectively with the SSA representatives on the phone. Each time she called, she spoke to a different representative, who told her a different thing. Based on these conversations, Ms. Adams understood that most of the documents that she mailed and faxed were not received or processed by SSA.

216.    Ms. Adams also had difficulty obtaining documents to submit to SSA. For example, Ms. Adams spent months trying to obtain documents from the Administration for Children's Services regarding the adoption subsidy to submit to SSA, and even went in person to that agency's offices to try to obtain the documentation, but was not allowed to enter due to pandemic restrictions.

217.    In June 2021, Ms. Adams filed a *pro se* request for a reconsideration of her overpayment, on the basis that SSA erred in counting the adoption payments as resources.

218.    Ms. Adams also asked SSA for a referral for legal assistance. SSA gave her numbers to call, but none of those numbers worked. Ms. Adams then called 3-1-1 and asked for legal assistance, and was eventually referred to a different legal services organization, which referred her to NYLAG. In July 2021, Ms. Adams reached NYLAG and sought legal assistance.

219.    On August 24, 2021, SSA confirmed to NYLAG that Ms. Adams's *pro se* reconsideration request remained pending.

220.    On August 24, 2021, NYLAG filed a request on Ms. Adams's behalf for a reconsideration of the termination of her benefits, on the basis that SSA erred in counting the adoption subsidy as income.

221.    On information and belief, no decision has been made on Ms. Adams's reconsideration requests as of the date of this Complaint.

222.    Ms. Adams has suffered harm stemming from SSA's actions.

223.    Ms. Adams has not received SSI benefits since November 2020. Ms. Adams has no money to support herself other than a small amount of Supplemental Nutrition Assistance Program (SNAP) benefits to pay for her food. She must rely on her adult daughter, who provides Ms. Adams a couple hundred dollars per month to pay for rent and other expenses.

224.    Ms. Adams has fallen behind on a number of her bills. Her cable was shut off, and she has received shutoff notices for her other utilities.

225.    Ms. Adams has suffered extreme stress, including panic attacks, from the overpayments and loss of benefits. This stress contributed to her physical health problems, resulting in multiple hospitalizations.

### Norman Marsh

226.    Norman Marsh is a 73-year-old who resides in the Bronx and lives alone.

227.    Mr. Marsh uses his SSI benefits to pay for his monthly expenses, including rent, food, and utilities.

228.    At the start of the COVID-19 pandemic, Mr. Marsh lost his job at a flea market and began to receive unemployment benefits.

229.    Mr. Marsh is at high risk for COVID-19 due to his age.

230.    During the COVID-19 pandemic, all New Yorkers were directed to avoid all non-essential gatherings, and New Yorkers over 70 years old were directed to take additional precautions.[14]

231.    On information and belief, on or about February 4, 2021, SSA sent Mr. Marsh an Overpayment Notice. This Overpayment Notice stated that Mr. Marsh was overpaid a total of $5,756.68. On information and belief, it said that he was paid $522 in each month from April to December 2020 and $529.34 in each month from January to February 2021 — but that in each of these months, he should have been paid $0 because he received too much income.

232.    On information and belief, this Overpayment Notice contained the "SPECIAL MESSAGE FOR OVERPAYMENTS BETWEEN MARCH AND SEPTEMBER 2020" quoted above at ¶¶ 122-23, including the following:

- "For us to waive the collection of the overpayment, two things have to be true:  It wasn't your fault that you got too much SSI money AND Paying us back would mean that you can't pay your bills for food, clothing, housing, medical care or other necessary expenses, or it would be unfair for some other reason."

- "You can ask for waiver at any time by completing the waiver form and returning it to us. The form is called 'Request for Waiver of Recovery or Change in Repayment Rate,' Form SSA-632."

- "If you have any questions, please: . . . . Write or visit any Social Security office. If you plan to visit an office, you may call ahead to make an appointment. The office that serves your areas is located at:  SOCIAL SECURITY, 2ND FLOOR, 1380 PARKER STREET, BRONX NY 10462. Please have this letter with you if you call or visit an office."

233.    On February 4, 2021, SSA sent Mr. Marsh a Notice of Planned Action that stated that Mr. Marsh would no longer receive any SSI benefits beginning in March 2021 because his "other income increased."

---

[14] *See, e.g.*, Mayor DeBlasio Issues New Guidance to New Yorkers (March 20, 2020), *available at* https://www1.nyc.gov/office-of-the-mayor/news/173-20/mayor-de-blasio-issues-new-guidance-new-yorkers.

234.    The Notice of Planned Action also contained more details regarding the income that SSA determined exceeded the allowable limit. The Notice stated that, for example, from April to June 2020, Mr. Marsh had received $3,128 in additional income.

235.    This income was Mr. Marsh's pandemic-related unemployment benefits, which should not have counted as income for SSI purposes.

236.    SSA counted this amount as being received monthly when in fact this amount was a lump sum of multiple months of unemployment benefits.

237.    SSA's current policy is that SSA will exclude all regular and pandemic unemployment from income and resources during the pandemic period. *See* EM-21050, EM-20014 REV 3. The pandemic period for unemployment purposes has different end dates depending on the state, territory, or tribal area. The earliest "Pandemic UIB End date" anywhere was in June 2021. In many places, including New York, the pandemic period for unemployment purposes is still ongoing as of the date of this filing. See EM-21050(B)(4).

238.    SSA made similar errors in subsequent months.

239.    The effect of these errors is that, on information and belief, Mr. Marsh was wrongly assessed an overpayment and wrongly had his benefits terminated when in fact he remained eligible for SSI and met all applicable SSA requirements.

240.    Shortly after receiving the Notices, Mr. Marsh sought the assistance of NYLAG.

241.    On information and belief, Mr. Marsh received $0 of SSI benefits in March 2021.

242.    On March 3, 2021, NYLAG filed a request for a reconsideration of Mr. Marsh's suspension and overpayment, on the basis that SSA erred in counting the unemployment payments as income.

243.    On March 12, 2021, SSA issued a notice raising Mr. Marsh's benefit from $0 to $529. However, the notice stated that $79 would be withheld from the $529 as recoupment for the overpayment.

244.    Mr. Marsh did not know (and could not have known) whether his overpayment was processed manually or automatically.

245.    Mr. Marsh did not know (and could not have known) when his overpayment was identified by SSA.

246.    On information and belief, none of Mr. Marsh's overpayment is eligible for the streamlined waiver under the IFR because his overpayment was identified by SSA after December 31, 2020. Specifically, SSA did not notify Mr. Marsh of the overpayment until February 2021, suggesting that it likely did not identify the overpayment until some point in early 2021.

247.    On information and belief, Mr. Marsh's overpayment for April through September 2020 would have been eligible for the streamlined waiver under the IFR if SSA had identified this overpayment on or before December 31, 2021.

248.    Mr. Marsh's overpayment for October 2020 through February 2021 is not eligible for the streamlined waiver under the IFR because the IFR extends only to overpayments incurred through September 2020.

249.    On information and belief, Mr. Marsh's entire overpayment would have been eligible for the streamlined waiver under the IFR if SSA had extended the IFR to cover the full period of the COVID-19 National Emergency.

250.    On information and belief, no decision has been made on Mr. Marsh's reconsideration request as of the date of this Complaint.

251.    On information and belief, Mr. Marsh did not receive his March SSI payment and he had his SSI benefits recouped at a monthly rate of $79 for April and May 2021.

252.    Mr. Marsh has suffered harm stemming from SSA's actions. Mr. Marsh is behind on bills and in arrears on his rent. This has caused him stress and anxiety.

**Betti Rodnyanskaya**

253.    Betti Rodnyanskaya is an 82-year-old who resides alone in Brighton Beach, Brooklyn.

254.    Ms. Rodnyanskaya is a native of Belarus.

255.    Ms. Rodnyanskaya does not speak fluent English. She has limited English reading skills and often does not comprehend the meaning of the English text she is able to read.

256.    Ms. Rodnyanskaya suffers from anxiety and depression, and these conditions can affect her short-term memory.

257.    Ms. Rodnyanskaya relies on a home health aide to assist her with basic daily activities, such as housekeeping, laundry, and grocery shopping.

258.    SSI and the Supplemental Nutrition Assistance Program (SNAP) are Ms. Rodnyanskaya's only source of income. She uses her SSI benefits to pay for her monthly expenses, including rent, food, and utilities.

259.    Ms. Rodnyanskaya does not manage her own bank account because she has physical health conditions and severe anxiety which make it difficult for her to go to the bank. Ms. Rodnyanskaya does not know how to use a debit card and does not know how to withdraw money from her bank account.

260.    Ms. Rodnyanskaya relies on assistance from her son-in-law, Michael Markhasin, who is her power of attorney on her bank account, to manage her account. He generally withdraws

the SSI benefits in cash and gives the cash to Ms. Rodnyanskaya, who then uses that cash to pay for her monthly expenses.

261.    At the start of the COVID-19 pandemic, Ms. Rodnyanskaya was unable to obtain this crucial assistance from her son-in-law. Both Ms. Rodnyanskaya and her son-in-law were quarantining as New York City was extremely hard-hit by the virus, with many hospitals exceeding capacity. All New Yorkers were directed to avoid all non-essential gatherings, and New Yorkers over 70 years old were directed to take additional precautions.[15]

262.    During this time, Ms. Rodnyanskaya temporarily moved in with her daughter and son-in-law because they were concerned that her home attendants might inadvertently infect her with COVID-19. She lived with them from approximately March 2020 to July 2020. She continued to pay the rent for her apartment during this period, but her food and utility expenses were slightly lower than usual.

263.    Ms. Rodnyanskaya and the Markhasins tried to go outside the apartment as little as possible, both for their own safety and because they were trying to follow the advice of public health experts.

264.    As a result, Ms. Rodnyanskaya's son-in-law was unable to go to the bank on Ms. Rodnyanskaya's behalf from late February to late April 2020.

265.    Because Ms. Rodnyanskaya's son-in-law could not go to the bank on her behalf during this time period, Ms. Rodnyanskaya's account balance exceeded $2,000, the allowable asset limit.

266.    When Ms. Rodnyanskaya's son-in-law resumed withdrawals on Ms. Rodnyanskaya's behalf in late April 2020, he did not withdraw sufficient extra cash to

---

[15] *See, e.g.*, Mayor DeBlasio Issues New Guidance to New Yorkers (March 20, 2020), *available at* https://www1.nyc.gov/office-of-the-mayor/news/173-20/mayor-de-blasio-issues-new-guidance-new-yorkers.

compensate for the missed withdrawals. Accordingly, Ms. Rodnyanskaya's account balance remained above $2,000.

267. Ms. Rodnyanskaya's son-in-law periodically made withdrawals on Ms. Rodnyanskaya's behalf for the remainder of 2020 and into 2021, as he was able given the circumstances of the pandemic.

268. During this period, Ms. Rodnyanskaya was not aware of her bank account balance, let alone that the balance grew to be above the $2,000 resource limit.

269. Ms. Rodnyanskaya was not able to report her change in resources to SSA for multiple reasons, including that she does not manage her bank account, that she was not aware that her resources exceeded $2,000, and that she did not know how to contact SSA while its offices were closed.

270. Ms. Rodnyanskaya received a recertification packet in the mail in approximately January 2021. A recertification packet is the paperwork that each SSI recipient must complete every one to two years to continue receiving SSI benefits. Ms. Rodnyanskaya completed the packet with the help of her daughter.

271. Ms. Rodnyanskaya was scheduled for a recertification conference by telephone at 10:00 a.m. on February 12, 2021. Her daughter, Margarita Markhasina, waited by the phone with her for hours, but SSA never contacted her. After several hours, Ms. Markhasina called SSA. She was put on hold multiple times and was told that the SSA employee she spoke to could not see the recertification appointment in the SSA system.

272. Finally, Ms. Markhasina spoke with a supervisor, who asked her questions about Ms. Rodnyanskaya's finances. Ms. Markhasina did not know the exact balance in Ms.

Rodnyanskaya's bank account, so she explicitly told the SSA supervisor that she could only estimate the amount. The supervisor told her not to worry.

273.     On February 24, 2021, SSA sent Ms. Rodnyanskaya an Overpayment Notice.

274.     This Overpayment Notice stated that Ms. Rodnyanskaya was paid $783 in March, April, May, June, July, September, and October 2020 and $794 in January and February 2021—but that in each of these months, she should have been paid $0 because her "resources were more than a person could own and still get SSI," that is, more than the $2,000 allowable limit.[16]

275.     This Overpayment Notice contained the "SPECIAL MESSAGE FOR OVERPAYMENTS BETWEEN MARCH AND SEPTEMBER 2020" quoted above at ¶¶ 122-23, including the following:

- "For us to waive the collection of the overpayment, two things have to be true:  It wasn't your fault that you got too much SSI money AND Paying us back would mean that you can't pay your bills for food, clothing, housing, medical care or other necessary expenses, or it would be unfair for some other reason."

- "You can ask for waiver at any time by completing the waiver form and returning it to us. The form is called 'Request for Waiver of Recovery or Change in Repayment Rate,' Form SSA-632."

- "If you have any questions, please: . . . . Write or visit any Social Security office. If you plan to visit an office, you may call ahead to make an appointment. The office that serves your areas is located at:  SOCIAL SECURITY, 7714 17 AVENUE, BROOKLYN NY 11214. Please have this letter with you if you call or visit an office."

276.     The Overpayment Notice stated that starting in May 2021, Ms. Rodnyanskaya would have $79.40 withheld from her benefits each month, as recoupment for the overpayment.

---

[16] The Overpayment Notice also stated that Ms. Rodnyanskaya had an overpayment for March, April, and November 2019.

277.    On the same day, February 24, 2021, SSA sent Ms. Rodnyanskaya a Notice of Change in Payment that contained more details regarding the resources that SSA determined exceeded the allowable limit.

278.    The Notice of Change in Payment stated that in each of the 2020 and 2021 months for which SSA assessed an overpayment for Ms. Rodnyanskaya (March, April, May, June, July, September, and October 2020 and January and February 2021), Ms. Rodnyanskaya had more than the allowable $2,000 in her bank account.

279.    The Notice showed that in all of these months, Ms. Rodnyanskaya exceeded the limit by just a few hundred dollars. In June 2020, for example, she was just $96.31 over the allowable limit. The highest balance was in April 2020, when she was $727.50 over the allowable limit.

280.    In March 2021, Ms. Rodnyanskaya was referred to NYLAG.

281.    On April 3, 2021, SSA sent Ms. Rodnyanskaya another notice stating that $79.40 would be recouped each month beginning in May 2021.

282.    SSA began recouping Ms. Rodnyanskaya's alleged overpayment in May 2021 by reducing her monthly SSI benefit by 10%. NYLAG began preparing the waiver form and pulling together the documentation to support Ms. Rodnyanskaya's waiver request.

283.    On June 14, 2021, NYLAG filed a request on Ms. Rodnyanskaya's behalf for a waiver of her overpayment. NYLAG submitted SSA Form 632 with a cover letter explaining that Ms. Rodnyanskaya was entitled to a waiver because she was without fault in causing the overpayment and that recovery of the overpayment would defeat the purpose of the SSI program.

284.    Ms. Rodnyanskaya did not know (and could not have known) whether her overpayment was processed manually or automatically.

285.    Ms. Rodnyanskaya did not know (and could not have known) for certain when her overpayment was identified by SSA.

286.    On information and belief, none of Ms. Rodnyanskaya's overpayment is eligible for the streamlined waiver under the IFR because her overpayment was identified by SSA after December 31, 2020. Specifically, SSA did not notify Ms. Rodnyanskaya of the overpayment until late February 2021, suggesting that it likely did not identify the overpayment until some point in early 2021.

287.    On information and belief, Ms. Rodnyanskaya's overpayment for March, April, May, June, July, and September 2020 would have been eligible for the streamlined waiver under the IFR if SSA had identified this overpayment on or before December 31, 2021.

288.    Ms. Rodnyanskaya's overpayment for October 2020 and January and February 2021 is not eligible for the streamlined waiver under the IFR because the IFR extends only to overpayments incurred through September 2020.

289.    On information and belief, Ms. Rodnyanskaya's entire overpayment would have been eligible for the streamlined waiver under the IFR if SSA had extended the IFR to cover the full period of the COVID-19 National Emergency.

290.    On September 3, 2021, SSA confirmed to NYLAG that Ms. Rodnyanskaya's waiver request remained pending.

291.    No decision has been made on that waiver request as of the date of this Complaint.

292.    Ms. Rodnyanskaya's benefits have been recouped in the amount of $79.40 in each month between May 2021 and present. This means that she has less money each month for necessities like food and toiletries.

293.    Receiving the Overpayment Notice has caused Ms. Rodnyanskaya significant stress and exacerbated her mental health conditions.

## **THE CLASS**

294.    Plaintiffs LaQuana Campos, Tosha Adams, Norman Marsh, and Betti Rodnyanskaya bring this action, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class consisting of:

> All current and future recipients of Supplemental Security Income who have been or will be assessed an overpayment debt incurred at any point between March 2020 and the end of the COVID-19 National Emergency.

295.    Plaintiffs and the class challenge Defendant's assessment of overpayments against SSI recipients during the pendency of the COVID-19 National Emergency, including the IFR itself, Defendant's implementation of the IFR, and Defendant's notice practices related to the IFR.

296.    The class is so numerous that joinder of all class members in this action would be impracticable. More than 7.7 million individuals receive SSI benefits and are subject to potential arbitrary recoupment of their benefits.

297.    Many SSI recipients whose benefits SSA wrongfully recoups are unable to find legal assistance.

298.    SSI recipients faced with recoupment for reasons of purported financial ineligibility have a difficult time finding representation. The majority of legal services providers that assist SSI recipients do so only, or primarily, by challenging adverse *disability* determinations, not adverse determinations of financial eligibility. Accordingly, there is a shortage of free legal assistance available for these individuals.

299.   Members of the class are, by definition, disabled and/or elderly indigent individuals, and rely on their SSI benefits to meet their basic shelter and nutritional needs.

300.   Without certification of a class action seeking common redress for these individuals, members of the putative class are unlikely to be able to obtain individual redress for their claims. Their rights under the law may well be meaningless without certification of a class.

301.   Plaintiffs and the putative class members are not seeking to have their benefits reinstated outside of the normal SSA procedures; rather, they are challenging SSA's IFR and related systemic actions by the Agency.

302.   As a result of the practices described above, there are questions of fact common to the class, including whether SSA accepted no-fault streamlined waiver requests by telephone and whether all recipients received a substantially similar notice from SSA regarding their overpayments and the opportunity to seek a no-fault streamlined waiver.

303.   There are also questions of law common to the class, including whether SSA's application of the no-fault streamlined waiver in the IFR to manually identified overpayments, but not automatically identified overpayments was arbitrary and capricious, whether SSA's application of the no-fault streamlined waiver in the IFR only to overpayments identified on or before December 31, 2020 was arbitrary and capricious, and whether SSA violated recipients' due process rights.

304.   Plaintiffs' claims are typical of the claims of the class in that Plaintiffs were assessed overpayments by SSA during the COVID-19 National Emergency, did not obtain no-fault streamlined waivers, and have suffered resulting harm.

305.    Plaintiffs will adequately represent the interests of the class. They are members of the class and there are no conflicts of interest between them and other class members in that all proposed class members would benefit from the relief sought in this action.

306.    Plaintiffs are represented by NYLAG, a public-interest law firm with extensive experience in litigating class-action cases, including numerous cases involving public benefits and Social Security, specifically. NYLAG's Disability Advocacy Project assists approximately 200 clients per year in challenging SSI suspensions, terminations, or overpayments based on their financial eligibility.

307.    Plaintiffs also are represented by Justice in Aging ("JIA"), a nonprofit legal advocacy firm representing low income older adults on issues relating to income stability and access to health care. JIA has experience and expertise in public benefit programs relied upon by older adults, including Social Security law. JIA has engaged in class action litigation across the country, including Social Security matters. The lawyers assigned to this case have specific knowledge and expertise in Social Security law and the needs of low income older adults. JIA has been co-counsel with NYLAG and Arnold & Porter on other cases involving public benefits and Social Security.

308.    Plaintiffs also are represented by Arnold & Porter, a law firm with extensive global reach, experience and deep knowledge across geographic, cultural, technological and ideological borders. Arnold & Porter has extensive experience in litigating class-action cases, and has previously served as co-counsel with NYLAG and Justice in Aging in a class action involving public benefits and Social Security.

309.    SSI recipients have been severely harmed, and are being harmed on an ongoing basis, by SSA's flawed IFR, flawed implementation, and flawed notices.

310.    A class action is the appropriate method for a fair and efficient adjudication of this matter in that the Defendant has acted or refused to act in a manner generally applicable to the class as a whole and a class action will avoid numerous separate actions by class members that would unduly burden the courts and create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate to the class as a whole.

## FIRST CAUSE OF ACTION
### *Agency Rule is Arbitrary, Capricious, or Contrary to Law*

311.    A federal agency may not promulgate a regulation that is arbitrary, capricious, or contrary to law. 5 U.S.C. § 706(2); *Bowen v. Yuckert*, 482 U.S. 137, 145 (1987).

312.    The IFR is arbitrary, capricious, or otherwise contrary to law in multiple ways, including, but not limited to:

a.    The IFR applies only to manually processed overpayments and not to automatically processed overpayments;

b.    The IFR applies only to overpayments for which Plaintiffs and class members were able to submit eligibility-related documentation to SSA for review, and not to overpayments stemming from Plaintiffs' and class members' inability to submit documentation to SSA due to pandemic conditions;

c.    The IFR applies only to overpayments incurred from March through September 2020 and not to the entire period of the ongoing COVID-19 National Emergency;

d.    The IFR applies only to overpayments which met the IFR's criteria and which the SSA identified on or before December 31, 2020, and not to overpayments that met the IFR's criteria, but which the SSA failed to identify until after that date; and

e.       The IFR applies only to overpayments for which Plaintiffs and class members submit a waiver and not to all overpayments meeting its criteria.

313.    Plaintiffs and the class members have been harmed by the IFR and remain at risk of future harm if Defendant's unlawful practices are not enjoined.

**SECOND CAUSE OF ACTION**
*Agency Action Is Arbitrary, Capricious, or Contrary to Law*

314.    A federal agency may not take any action or promulgate any sub-regulatory guidance that is arbitrary, capricious, or is contrary to law or to the agency's own regulations.

315.    After the promulgation of the IFR, the SSA's practice was to require Plaintiffs and class members whose overpayments were covered by the IFR to fill out the waiver form (SSA-632), despite the IFR's statement that Plaintiffs and class members will "**not** be required" to do so. 85 Fed. Reg. 52,911 (emphasis added). This practice is arbitrary, capricious, or otherwise contrary to law or the IFR.

316.    Moreover, the EM and Revised EM are sub-regulatory guidance that are arbitrary, capricious, or contrary to law or the IFR in multiple ways, including, but not limited to:

a.       Limiting the IFR's protections to overpayments that met the IFR's requirements and also were coded in a particular way in the SSA's computer system, instead of applying the IFR's protections to all overpayments that met the IFR's requirements regardless of how they were coded; and

b.       Failing to require SSA staff to re-review accounts after the issuance of the REM to determine whether Plaintiffs and class members who previously requested waivers, but were denied due to the EM, were actually eligible for the IFR's streamlined waiver process.

317.    The SSA also failed adequately to implement the IFR in other ways.

318.    Plaintiffs and the class members have been harmed by the EM, Revised EM, and SSA's practices and remain at risk of future harm if Defendant's unlawful practices are not enjoined.

## THIRD CAUSE OF ACTION
### *Violation of Due Process Clause*

319.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides in relevant part that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."

320.    Plaintiffs' and class members' interest in receiving SSI benefits is a property right covered by the Due Process Clause of the Fifth Amendment.

321.    Defendant's practice of threatening to recoup, and of actually recouping, SSI benefits because Plaintiffs and class members incurred an overpayment debt during the COVID-19 National Emergency is irrational, arbitrary, capricious, and/or fails to apply ascertainable standards in a rational and consistent manner, in violation of Plaintiffs' and class members' rights under the Due Process Clause of the Fifth Amendment, U.S. Const. Amend. V.

322.    Plaintiffs and the class members have been harmed by this custom and practice and remain at risk of future harm if Defendant's unlawful practices are not enjoined.

## FOURTH CAUSE OF ACTION
### *Violation of Due Process Clause—Adequate Notice*

323.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides in relevant part that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."

324.    Plaintiffs' and class members' interests in receiving SSI benefits is a property right covered by the Due Process Clause of the Fifth Amendment.

325.    Defendant's Notices regarding overpayments allegedly received by Plaintiffs and class members during the COVID-19 National Emergency are irrational, arbitrary, capricious, contrary to law or regulation, and/or fail to apply ascertainable standards in a rational and consistent manner, in violation of Plaintiffs' and class members' rights under the Due Process Clause of the Fifth Amendment, U.S. Const. Amend. V, in multiple ways, including, but not limited to:

        a.    Failing to inform Plaintiffs and class members of the no-fault presumption of the IFR;

        b.    Failing to inform Plaintiffs and class members of the determination that recovery of any overpayment debt covered by the IFR would be against equity and good conscience;

        c.    Failing to inform Plaintiffs and class members that SSA field offices are closed and of the impact the closures have; and

        d.    Failing to inform Plaintiffs and class members that a waiver form is not required for overpayment debts covered by the IFR.

326.    Plaintiffs and the class members have been harmed by this custom and practice and remain at risk of future harm if Defendant's unlawful practices are not enjoined.

### FIFTH CAUSE OF ACTION
#### *Violation of Equal Protection Clause*

327.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, as incorporated into the Fifth Amendment to the U.S. Constitution, provides in relevant part that the United States shall not deny to any person within its jurisdiction the equal protection of the laws.

328.    Defendant's custom and practice of recouping SSI benefits pursuant to the IFR arbitrarily discriminates between similarly situated SSI recipients in multiple ways, including, but not limited to:

a.    The IFR applies only to manually processed overpayments and not to automatically processed overpayments, despite Plaintiffs' and class members having no control over whether SSA will review their eligibility through a "manual" or "automated" process and no knowledge about that from Overpayment Notices, which do not provide that information;

b.    The IFR applies only to overpayments for which Plaintiffs and class members were able to submit eligibility-related documentation to SSA for review, and not to overpayments stemming from their inability to submit documentation to SSA due to pandemic conditions, despite the fact that in both circumstances, it is the SSA's actions in response to the pandemic (including suspending certain operations and closing field offices) that led to the overpayment;

c.    The IFR applies only to overpayments incurred from March through September 2020, and not to the entire period of the ongoing COVID-19 National Emergency despite the fact that Plaintiffs and class members who incurred overpayments after September 2020 are similarly affected by the ongoing COVID-19 National Emergency; and

d.    The IFR applies only to overpayments which met the IFR's criteria and which the SSA identified on or before December 31, 2020, and not to overpayments that met the IFR's criteria, but which the SSA failed to identify until after that date, despite

Plaintiffs and class members having no control over when the SSA identifies an overpayment.

329.    Plaintiffs and class members have been harmed by this custom and practice and remain at risk of future harm if Defendant's unlawful practices are not enjoined.

**SIXTH CAUSE OF ACTION**
*Mandamus*

330.    The Commissioner of Social Security "*shall* make such provision as the Commissioner finds appropriate in the case of payment of more than the correct amount of benefits with respect to an individual with a view to avoiding penalizing such individual or his eligible spouse who was without fault in connection with the overpayment, if adjustment or recovery on account of such overpayment in such case would defeat the purposes of this subchapter, or be against equity and good conscience. . . ." 42 U.S.C. § 1383(b)(1)(B) (emphasis added).

331.    The IFR provides that SSA "*will* presume overpaid individuals are without fault in having caused the qualifying overpayment debt" and "*will* determine that recovery of . . . qualifying overpayment debt incurred during the pandemic period would be against equity and good conscience." 85 Fed. Reg. at 52,910 (emphasis added).

332.    Defendant's actions in accepting, reviewing, and approving overpayment waivers are official actions.

333.    Defendant's duty to act is plainly prescribed and without discretion.

334.    Plaintiffs and class members have the right to receive SSI benefits if they are eligible under applicable statute and regulation. Plaintiffs and class members have the right to receive an overpayment waiver if they are eligible under applicable statute and regulation.

Plaintiffs and class members also have the right not to be deprived of their property by arbitrary, capricious, or irrational government action.

335.    Defendant fails to perform her nondiscretionary regulatory duty to:

a.    Issue waivers covered by the IFR without requiring the recipient to complete a Form 632; and

b.    Issue waivers covered by the IFR, because of the way those waivers were coded in SSA's computer system.

336.    This duty is owed to all SSI recipients. Defendant's failure to perform her nondiscretionary duty results in the threat of unlawful recoupment, or recoupment, of Plaintiffs' and class members' SSI benefits, and denies Plaintiffs and class members their rights under federal law.

337.    Plaintiffs seek to compel Defendant to perform this nondiscretionary duty pursuant to 28 U.S.C. § 1361.

338.    No alternative means of relief exists.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment:

1.    Certifying this case as a class action, pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, with the class defined as:

All current and future recipients of Supplemental Security Income who have been or will be assessed an overpayment debt incurred at any point between March 2020 and the end of the COVID-19 National Emergency.

2.    Vacating the IFR insofar as it is arbitrary and capricious;

3.    Declaring that:

a.    The IFR is arbitrary, capricious, or contrary to law;

    b.   SSA's actions and sub-regulatory guidance regarding the IFR are arbitrary, capricious, or contrary to law;

    c.   Defendant's practice of recouping, or threatening to recoup, SSI benefits for overpayments incurred during the COVID-19 National Emergency violates recipients' right to due process;

    d.   Defendant's notices regarding overpayments assessed during the COVID-19 National Emergency violate recipients' right to due process; and

    e.   The IFR violates the Equal Protection Clause of the United States Constitution.

4.    Issuing an injunction that:

    a.   Defendant is prohibited from seeking to recoup, and from actually recouping, SSI benefits as a result of overpayments incurred at any point between March 2020 and the end of the COVID-19 National Emergency;

    b.   Defendant must re-open and re-adjudicate all previously assessed overpayments that were incurred at any point between March 2020 and the end of the COVID-19 National Emergency and have not been waived in full;

    c.   Defendant must reverse all previously recouped overpayments incurred at any point between March 2020 and the end of the COVID-19 National Emergency; and

    d.   Defendant must send Overpayment Notices that adequately inform recipients of their rights.

5.    Awarding reasonable attorneys' fees, costs and disbursements; and

6.    Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.


Dated: September 15, 2021
New York, New York

By: */s/ Sheila S. Boston*
Sheila S. Boston
Carmela T. Romeo
Michael J. Block
Tyler J. Fink (*pro hac vice* to be filed)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Email: sheila.boston@arnoldporter.com
Email: carmela.romeo@arnoldporter.com
Email: michael.block@arnoldporter.com
Email: tyler.fink@arnoldporter.com

| | |
|---|---|
| Kathryn Lang (*pro hac vice* to be filed)<br>Regan Bailey (*pro hac vice* to be filed)<br>Carol Wong (*pro hac vice* to be filed)<br>JUSTICE IN AGING<br>1444 Eye Street NW, Suite 1100<br>Washington, DC 20005<br>Telephone: (202) 683-1997<br>Email: klang@justiceinaging.org<br>Email: rbailey@justiceinaging.org<br>Email: cwong@justiceinaging.org | Danielle Tarantolo<br>Michelle Spadafore<br>Elizabeth Jois<br>Jessica Ranucci<br>NEW YORK LEGAL ASSISTANCE GROUP<br>100 Pearl Street, 19th Floor<br>New York, NY 10004<br>Telephone: (212) 613-5000<br>Facsimile: (212) 750-0820<br>Email: dtarantolo@nylag.org<br>Email: mspadafore@nylag.org<br>Email: ejois@nylag.org<br>Email: jranucci@nylag.org |