UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x
LAQUANA CAMPOS, on behalf of herself and her
minor child, K.C.; TOSHA ADAMS; NORMAN
MARSH; and BETTI RODNYANSKAYA, individually
and on behalf of all persons similarly situated,

       Plaintiffs,       **Case No. 21-CV-05143**

    -against-        Date of service: Oct. 26, 2021

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

       Defendant.
-------------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................... 2

BACKGROUND ......................................................................................................... 4

I.    The SSI Program Provides Recipients with Critical Benefits Necessary to
      Maintain a Basic Standard of Living. ................................................................ 4

II.   The Pandemic Has Precluded SSI Recipients from Effectively Communicating
      with SSA, Causing Many Recipients to Be Issued Overpayments........................ 6

      A.    In March 2020, SSA Closed Its Field Offices and Stopped Manually
            Processing Overpayments, Reducing SSI Recipients' Ability to Resolve
            Overpayment Issues. ................................................................................. 7

      B.    In August 2020, SSA Promulgated a Flawed Interim Final Rule to Address
            Overpayment Issues Resulting From Its Pandemic Response. ............................ 9

      C.    SSA's Implementation of the IFR Has Also Been Flawed, Including That
            the Overpayment Notice Fails to Give Meaningful Guidance to SSI
            Recipients................................................................................................. 10

III.  Facts Concerning the Four Named Plaintiffs.................................................... 12

      A.    LaQuana Campos and Her Minor Child K.C. ............................................ 13

      B.    Tosha Adams ......................................................................................... 15

      C.    Norman Marsh ....................................................................................... 16

      D.    Betti Rodnyanskaya ................................................................................ 17

ARGUMENT ............................................................................................................ 19

I.    Named Plaintiffs and Putative Class Members' Motion for a Preliminary
      Injunction Should Be Granted. ....................................................................... 19

      A.    Named Plaintiffs and Putative Class Members Have Suffered and Will
            Continue to Suffer Irreparable Harm Unless the Preliminary Relief Is
            Granted................................................................................................... 21

      B.    Named Plaintiffs and Putative Class Members Are Likely to Succeed on
            the Merits. .............................................................................................. 23

            1.    The IFR's So-Called "Pandemic Period" Definition Is Arbitrary
                  and Capricious. ............................................................................. 25

            2.    The IFR's Requirement That a Qualifying Overpayment Must
                  Have Been Identified by SSA by December 31, 2020, Is Arbitrary
                  and Capricious. ............................................................................. 28

            3.    The IFR Is Arbitrary and Capricious Because It Fails to Consider
                  Ongoing Pandemic-Related Barriers to Submitting Information to
                  and Obtaining Information from SSA................................................ 31

i

4.      The IFR Is Arbitrary and Capricious Because It Applies Only to Manually Processed Overpayments, Not to Automatically Processed Overpayments. ........................................................ 32

5.      Despite Having All Necessary Information to Waive Identified Overpayments, SSA Arbitrarily and Capriciously Requires Recipients to Affirmatively Request Relief. ............................... 33

6.      The IFR Violates the Due Process Clause. ................................. 35

7.      The IFR Violates the Equal Protection Guarantee of the Fifth Amendment ........................................................................... 38

C.      Named Plaintiffs and Putative Class Members Have Presented a Serious Question That Is Fair Grounds for Trial, and the Balance of Hardships Tips Decidedly in Plaintiffs' Favor ........................................... 39

II.     The Proposed Class Should Be Certified. ...................................................... 41

A.      Courts Routinely Certify Classes in Similar Cases ............................... 42

B.      The Class Satisfies the Requirements of Rule 23(a). ............................ 42

1.      The Class Is So Numerous That Joinder of All Class Members Is Impracticable ...................................................................... 42

2.      Class Members Share Common Issues of Law and Fact. ........ 44

3.      Named Plaintiffs' Claims Are Typical of the Class. ................. 45

4.      Named Plaintiffs and Their Counsel Adequately Represent the Class. ................................................................................ 46

5.      The Class Satisfies the Requirements of Rule 23(b)(2). .......... 47

CONCLUSION ................................................................................................. 48

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020) ...................................................................................................41

*Alexander A. ex rel. Barr v. Novello*,
   210 F.R.D. 27 (E.D.N.Y. 2002) ..............................................................................................43

*Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ......................................................................................................24, 25, 26

*Becker v. Toia*,
   439 F. Supp. 324 (S.D.N.Y. 1977)..........................................................................................21

*Berkson v. Gogo LLC*,
   147 F. Supp. 3d 123 (E.D.N.Y. 2015) ....................................................................................42

*Bowen v. Yuckert*,
   482 U.S. 137 (1987).................................................................................................................24

*Buckner v. Maher*,
   424 F. Supp. 366 (1976) .........................................................................................................34

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ...................................................................................................24

*California v. U.S. HHS*,
   941 F.3d 410 (9th Cir. 2019) ...................................................................................................21

*Career Coll. Ass'n v. Riley*,
   74 F.3d 1265 (D.C. Cir. 1996) ................................................................................................24

*Carrillo v. Schneider Logistics, Inc.*,
   No. CV11-8557 CAS, 2012 WL 556309 (C.D. Cal. Jan. 31, 2012), *aff'd*, 501
   F. App'x 713 (9th Cir. 2012) ..................................................................................................41

*Catanzano v. Dowling*,
   847 F. Supp. 1074 ...................................................................................................................42

*Chavarria v. N.Y. Airport Serv., LLC*,
   875 F. Supp. 2d 164, 169 (E.D.N.Y. 2012) ...........................................................................42

*Cincotta v. N.Y.C. Hum. Res. Admin.*,
   No. 00 Civ., 9064(JGK), 2001 WL 897176 (S.D.N.Y. Aug. 9, 2001) ...................................22

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)...........................................................................19, 39

*Clark v. Astrue*,
    274 F.R.D. 462 (S.D.N.Y. 2011) ..........................................................................47

*Cleveland Bd. of Educ. v. LaFleur*,
    414 U.S. 632 (1974)..............................................................................................26

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995)....................................................................................43

*Cortigiano v. Oceanview Manor Home for Adults*,
    227 F.R.D. 194 (E.D.N.Y. 2005) ..........................................................................45

*Cruz v. Zucker*,
    195 F. Supp. 3d 554 (S.D.N.Y. July 5, 2016), *modified on other grounds on*
    *reconsideration by* 218 F. Supp. 3d 246 (S.D.N.Y. Nov. 14, 2016).....................44

*Davis v. City of New York*,
    296 F.R.D. 158 (S.D.N.Y. 2013) ..........................................................................44

*Davis v. Proud*,
    2 F. Supp. 3d 460 (E.D.N.Y. 2014) ......................................................................36

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006)..................................................................................41

*Does v. Shapiro*,
    302 F. Supp. 761 (D. Conn. 1960) ........................................................................34

*E. Bay Sanctuary Covenant v. Barr*,
    385 F. Supp. 3d 922 (N.D. Cal. 2019) ..................................................................21

*Ford v. Shalala*,
    87 F. Supp. 2d 163 (E.D.N.Y. 1999), *judgment entered sub nom. Ford v.*
    *Apfel*, No. CV-94-2736 (CPS), 2000 WL 281888 (E.D.N.Y. Jan. 13, 2000)...................35, 36

*Goldberg v. Kelly*,
    397 U.S. 254 (1970)........................................................................................22, 35

*Green Party v. N.Y. State Bd. of Elections*,
    389 F.3d 411 (2d Cir. 2004)..................................................................................19

*Guadagna v. Zucker*,
    332 F.R.D. 86 (E.D.N.Y. 2019) ............................................................................44

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*,
   201 F.R.D. 326 (S.D.N.Y. 2001) ........................................................................45

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) ..........................................................................21

*Heckler v. Campbell*,
   461 U.S. 458 (1983) ..........................................................................................24

*Heller v. Doe*,
   509 U.S. 312 (1993) ..........................................................................................38

*Henrietta D. v. Giuliani*,
   119 F. Supp. 2d 181 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v.*
   *Bloomberg*, 331 F.3d 261 (2d Cir. 2003) .........................................................22

*Hicks v. Comm'r of Soc. Sec.*,
   909 F.3d 786 (6th Cir. 2018) .......................................................26, 28, 30, 33

*Hilton v. Wright*,
   235 F.R.D. 40 (N.D.N.Y. 2006).................................................................45, 47

*Hurley v. Toia*,
   432 F. Supp. 1170 (S.D.N.Y. 1977), *aff'd*, 573 F.2d 1291 (2d Cir. 1977) .............21

*In re Alcoholic Beverages Litig.*,
   95 F.R.D. 321 (E.D.N.Y. 1982) ........................................................................43

*In re Arotech Corp. Sec. Litig.*,
   No. 07-CV-1838 (RJD)(VVP), 2010 WL 2301195 (E.D.N.Y. June 7, 2010)........................42

*Isaacs v. Bowen*,
   865 F.2d 468 (2d Cir. 1989).............................................................................36

*Islam v. Cuomo*,
   475 F. Supp. 3d 144 (E.D.N.Y. 2020) ...............................................................21

*Jane B. v. N.Y.C. Dep't of Soc. Servs.*,
   117 F.R.D. 64 (S.D.N.Y. 1987) ........................................................................43

*Jones v. Califano*,
   576 F.2d 12 (2d Cir. 1978)................................................................................39

*Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n*,
   396 F. Supp. 3d 113 (D.D.C. 2019) .................................................................29

*Kirk v. Comm'r of Soc. Sec. Admin.*,
   987 F.3d 314 (4th Cir. 2021) .......................................................26, 28, 33

*Ligon v. City of New York*,
     288 F.R.D. 72 (S.D.N.Y. 2013) ...................................................................44

*M.K.B.*, 445 F. Supp. 2d at 442 ......................................................................47

*M.G. v. N.Y.C. Dep't of Educ.*,
     162 F. Supp. 3d 216 (S.D.N.Y. 2016) ..........................................................44

*Marisol A.*, 126 F.3d at 376 ...........................................................................43

*Mastrio v. Sebelius*,
     768 F.3d 116 (2d Cir. 2014) .........................................................................20

*Mathews v. Eldridge*,
     424 U.S. 319 (1976) .........................................................................35, 37, 38

*Mayer v. Wing*,
     922 F. Supp. 902 (S.D.N.Y. 1996) ..........................................................42, 48

*Miller v. Bond*,
     641 F.2d 997 (D.C. Cir. 1981) .....................................................................26

*Morel v. Giuliani*,
     927 F. Supp. 622 (S.D.N.Y. 1995) .....................................................22, 39, 42

*N.Y. Pub. Int. Rsch. Grp. v. Whitman*,
     321 F.3d 316 (2d Cir. 2003) .........................................................................24

*Nat'l Ass'n for the Advancement of Colored People v. Town of E. Haven*,
     70 F.3d 219 (2d Cir. 1995) ...........................................................................21

*Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*,
     145 F.3d 1399 (D.C. Cir. 1998) ...................................................................21

*New York v. U.S. E.P.A.*,
     350 F. Supp. 2d 429 (S.D.N.Y. 2004), *aff'd sub nom. Nat. Res. Def. Council v.
     Johnson*, 461 F.3d 164 (2d Cir. 2006) ........................................................24

*Olson v. Wing*,
     281 F. Supp. 2d 476 (E.D.N.Y.), *aff'd*, 66 F. App'x 275 (2d Cir. 2003)..........22, 40

*Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*,
     990 F.3d 217 (2d Cir. 2021)..........................................................................24

*Regents of the Univ. of Cal. v. DHS*,
     279 F. Supp. 3d 1011 (N.D. Cal. 2018) .......................................................20

*Reynolds v. Giuliani*,
   35 F. Supp. 2d 331 (S.D.N.Y. 1999)..................................................................20, 21, 45, 46

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)..................................................................................43, 45

*Roman Cath. Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*,
   128 F. Supp. 3d 566 (E.D.N.Y. 2015) ...........................................................................38

*Romer v. Evans*,
   517 U.S. 620 (1996)......................................................................................................38

*Rosetti v. Shalala*,
   12 F.3d 1216 (3d Cir. 1993).........................................................................................21

*Rosetti v. Shalala*,
   No. 91-3389, 1994 WL 655803 (E.D. Pa. June 30, 1994)...........................................21

*Rosetti v. Sullivan*,
   788 F. Supp. 1380 (E.D. Pa. 1992) .............................................................................21

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...................................................................20, 39

*Schisler v. Sullivan*,
   3 F.3d 563 (2d Cir. 1993) ............................................................................................24

*Shakhnes*, 740 F. Supp. 2d at 628 ...................................................................................47

*Stinson v. City of New York*,
   282 F.R.D. 360 (S.D.N.Y. 2012) .................................................................................43

*U.S. v. Oakland Cannabis Buyers' Co-op*,
   532 U.S. 483 (2001)......................................................................................................21

*United States v. Mead Corp.*,
   533 U.S. 218 (2001)......................................................................................................24

*Vargas v. Meese*,
   682 F. Supp. 591 (D.D.C. 1987)..................................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)......................................................................................................44

*Waterkeeper All., Inc. v. U.S. E.P.A.*,
   399 F.3d 486 (2d Cir. 2005)......................................................................24, 25, 29, 32

*Weisenberg v. Town Bd. of Shelter Island*,
    404 F. Supp. 3d 720 (E.D.N.Y. 2019) ................................................................38

*White v. Mathews*,
    559 F2d 852, 858 (2d Cir. 1977)..........................................................................42

*Windsor v. U.S.*,
    699 F.3d 169, 180 (2d Cir. 2012), *aff'd*, 570 U.S. 744, 133 S. Ct. 2675, 186 L.
    Ed. 2d 808 (2013) ................................................................................................38

**Statutes**

42 U.S.C. § 1381 ..............................................................................................................4

42 U.S.C. § 1381a ............................................................................................................4

42 U.S.C. § 1382 ..........................................................................................................4, 5

42 U.S.C. § 1383(b)(1) ....................................................................................................7

Fed. R. Civ. P. 23(a) ...........................................................................................1, 41, 42

Fed. R. Civ. P. 23(a)(1)..................................................................................................42

Fed. R. Civ. P. 23(a)(2)..................................................................................................44

Fed. R. Civ. P. 23(a)(4)............................................................................................46, 47

Fed. R. Civ. P. 23(b)(2)..................................................................................1, 41, 47, 48

Fed. R. Civ. P. 65 ..........................................................................................................20

Fed. R. Civ. P. 65(a) ........................................................................................................1

Social Security Act .....................................................................................................3, 34

**Other Authorities**

20 C.F.R. § 416.110 ........................................................................................................4

20 C.F.R. § 416.550 ........................................................................................................7

20 C.F.R. § 416.552–54 ..................................................................................................7

20 C.F.R. § 416.558 (1995) ............................................................................................6

20 C.F.R. § 416.570 ....................................................................................................7, 22

20 C.F.R. § 416.708 ........................................................................................................5

20 C.F.R. § 416.1336 ...........................................................................................................6

85 Fed. Reg. 52,909 ................................................................................................. *passim*

85 Fed. Reg. 15337 (Mar. 18, 2020) No. 9994 ...................................................................1

86 Fed. Reg. 46897 (Aug. 20, 2021)....................................................................................7

Named Plaintiffs LaQuana Campos (on behalf of herself and her minor daughter), Tosha Adams, Norman Marsh, and Betti Rodnyanskaya filed suit against the Social Security Administration ("SSA" or the "Agency") on September 15, 2021, on behalf of themselves and a class of similarly situated current and future Supplemental Security Income ("SSI") recipients who have been or will be assessed an "overpayment" at any point between March 2020 and the end of the COVID-19 National Emergency,[1] which continues to this day.  Plaintiffs submit this Memorandum of Law in support of their motion, pursuant to Fed. R. Civ. P. 65(a), for a preliminary injunction for the putative class and for the Named Plaintiffs, and pursuant to Fed. R. Civ. P. 23(a) and (b)(2), for provisional certification of a class.

On behalf of the putative class, Named Plaintiffs seek a preliminary injunction directing that SSA institute an overpayment pause virtually the same as the one temporarily instituted between March through September 2020.  Pursuant to this class-wide injunction, SSA would once again refrain from assessing and recouping overpayments arising during the COVID-19 National Emergency.[2]  This preliminary injunction is necessary to ensure that the putative class does not suffer further irreparable harm as this Court resolves the merits of this litigation, and it supports SSA's stated goal of protecting recipients from serious economic hardship during the pandemic.

Separately, the Named Plaintiffs seek a preliminary injunction directing that SSA immediately resolve the Named Plaintiffs' pending applications for relief and restore their full benefits, including any benefits recouped since March 2020.

---

[1] In March 2020, then-President Trump issued a Proclamation declaring a National Emergency related to the pandemic (the "COVID-19 National Emergency"), Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 18, 2020), attached to Ex. A, the Declaration of Sheila Boston ( "Boston Decl."), as Ex. A-01.

[2] Plaintiffs are not asking that SSA refrain from recouping overpayments predating March 2020.

## PRELIMINARY STATEMENT

Recipients of SSI—a subsistence-level benefit available to low-income individuals who are elderly or have disabilities and live in conditions of poverty—rely on such benefits to maintain the most basic standard of living. These same recipients are often at the highest risk for contracting COVID-19, and sadly, comprise the vast majority of COVID-19 deaths.[3] Since early 2020, the world changed drastically due to the pandemic: public spaces and work offices closed their doors; Americans stayed home whenever possible; and the country relied almost entirely on the digital world for communications. This has posed innumerable difficulties for SSI recipients, who often lack appropriate technology, to communicate with SSA and navigate the procedural morass that is tied to maintaining their benefits. Prior to the pandemic, millions of SSI recipients relied on the ability to visit their local field offices to conduct their business, such as reporting changes in income or resources, providing relevant documentation, challenging any adverse actions taken on their cases, or asking questions about SSA's policies. But SSA—like the rest of the country—closed its doors on March 17, 2020. SSA offices remain closed to this day.[4]

In March 2020, SSA temporarily stopped manually processing and recovering "overpayments" from recipients. An "overpayment" occurs when an SSI recipient has received more in SSI benefits than that recipient was entitled to receive. A manually processed

---

[3] Adults 65 and older have been the most at risk of death from COVID-19 and have constituted almost 76% of COVID-19 deaths. Ex. A-02, *COVID-19 Mortality Overview*, CTRS. FOR DISEASE CONTROL & PREVENTION (last updated October 20, 2021), https://www.cdc.gov/nchs/covid19/mortality-overview.htm (section "Death by Age Group," calculating that as of October 20, 2021, 75.9% of COVID-19 deaths in the U.S. were among people 65 years and older). In addition, the risk of death from COVID-19 for persons with disabilities has been three times that of the general population.

[4] *See* Ex. A-03, Press Release, Soc. Sec. Admin. Social Security Offices Will Only Offer Phone Service (Mar. 16, 2020), https://www.ssa.gov/news/press/releases/2020/#3-2020-2 (effective Mar. 17, 2020). Today, SSA offices offer limited in-person appointments only for certain critical needs. *See* Ex. A-04, Off. of Pub. Serv. & Operations Support, Soc. Sec. Admin., In-Office Appointments Guidance (Sept. 8, 2021), EM-21056, https://secure.ssa.gov/apps10/reference.nsf/links/09082021124856PM.

overpayment is one that an SSA employee processes directly; an automatically processed overpayment is one that is automatically identified and processed by SSA's computer system.

In light of the foregoing, and acknowledging that COVID-19 rendered normal operations impossible, SSA issued an Interim Final Rule ("IFR") on August 27, 2020 that purported to create a streamlined waiver process for some—but by no means all—SSI recipients who accrued overpayments during the COVID-19 period. This streamlined process was intended to be simpler than the normal waiver, by presuming in the recipient's favor the two factors a recipient is normally required to show: (1) that he or she was without fault in causing the overpayment; and (2) that recoupment would be against equity and good conscience or otherwise defeat the purpose of the Social Security Act.

While it was necessary for SSA to provide relief to SSI recipients who were (and continue to be) adversely impacted by the pandemic, the IFR as written and implemented is arbitrary and capricious, and violates the Due Process and Equal Protection guarantees of the Fifth Amendment to the U.S. Constitution. The IFR applies nationwide but is limited to overpayments that: (1) were incurred during a "pandemic period" that SSA improperly defines as March 1, 2020 through September 31, 2020; (2) that SSA identified by December 31, 2020; (3) SSA processed manually (as opposed to through an automated process); and (4) where the SSI recipient proactively sought a waiver pursuant to the IFR. The IFR also ignored recipients' inability to submit documentation due to pandemic conditions. These limitations are arbitrary and capricious, and have precluded many recipients from obtaining waivers to which they are entitled.

SSA's implementation of this rule has also been significantly flawed. Many SSA workers do not understand the streamlined waiver process (and many do not even know that such a

3

waiver exists), the overpayments must be coded in a particular manner to be eligible, and SSA notices sent to recipients do not explain it effectively. And while the IFR apparently suggests that the COVID-19 National Emergency has ended (a suggestion belied by the fact that COVID-19 variants are running rampant and SSA's own local field offices remain almost completely closed), the Agency continues to assess improper overpayments.

The Named Plaintiffs are representative of how this flawed IFR has failed to protect SSI recipients during unprecedented pandemic conditions. All of the Named Plaintiffs have been assessed overpayments during the COVID-19 National Emergency; all have been unable to obtain relief through the streamlined waiver; and all have had their badly needed benefits recouped by SSA. Advocates around the country describe the same dire conditions for their own clients.

A preliminary injunction restoring SSA policies to those put in place at the beginning of the pandemic is both equitable and necessary to afford the putative class relief from SSA assessing and recouping alleged overpayments incurred during the pandemic, which irreparably harms these recipients on a daily basis as they face reduction in benefits they so desperately need.

## **BACKGROUND**

I.   **The SSI Program Provides Recipients with Critical Benefits Necessary to Maintain a Basic Standard of Living.**

The SSI program provides subsistence benefits for individuals with very low income, and who are also elderly or have significant disabilities. Compl. ¶ 24 (citing 42 U.S.C. §§ 1381, 1381a; 42 U.S.C. § 1382); Ex. B, Declaration of Katherine Means ("Means Decl."), ¶ 7. The program is intended to ensure that individuals who are elderly, disabled, or both maintain a "standard of living at the established Federal minimum income level." Compl. ¶ 24 (quoting 20

C.F.R. § 416.110).

SSI recipients are subject to strict income and resource tests set by statute.  42 U.S.C. § 1382; *see* Compl. ¶ 37 (less than $2,000 in resources if single and less than $3,000 if married (citing C.F.R. § 416.1205(c)), ¶ 38 (income limit is the federal benefit rate, which is $794 per month for an individual and $1,191 per month for a couple in 2021).[5]

Many changes in a person's circumstances can affect income, resources, or eligibility and thus can impact the amount of SSI benefits received.  *Id.* ¶ 40.  These include, among others: receiving earned or unearned income (including unemployment insurance benefits and certain other government benefits); increased resources; direct and indirect financial assistance from family and friends; a change in residence; or a change in marital status.

SSI recipients have a duty to report any changes in circumstances within ten days of the end of the month in which the change occurred.  *Id.* ¶ 41 (citing 20 C.F.R. § 416.708).  This requirement has not been waived or modified during the COVID-19 pandemic.  *Id.*  SSA's current policy requires that SSA exclude all regular and pandemic unemployment, as well as other pandemic-related disaster assistance, from income and resources. *See* Ex. A-06 (EM-21050 REV), Ex. A-07 (EM-20014 REV 4).[6]  SSA only began implementing these policies in July 2021; thus, many recipients had already been assessed overpayments due to the receipt of these exempt benefits.

Many SSI recipients, and the majority of Named Plaintiffs, are people of color.   In

---

[5] *See also* Ex. A-05, *SSI Federal Payment Amounts for 2022*, Soc. Sec. Admin, https://www.ssa.gov/oact/cola /SSI.html (last accessed Oct. 22, 2021).
[6] Ex. A-06, Off. of Ret. and Disability Pol'y, Soc. Sec. Admin, Special Processing Instructions for Applying Supplemental Security Income (SSI) Income and Resource Exclusions to Pandemic-Related Disaster Assistance (Sept. 30, 2021), EM-21050 REV, https://secure.ssa.gov/apps10/reference.nsf/links/09302021030344PM (hereinafter "EM-21050 REV"); Ex. A-07, Off. of Ret. and Disability Pol'y, Soc. Sec. Admin, Effect of COVID-19-Related Financial Assistance on SSI Income and Resources (Sept. 30, 2021), EM-20014 REV 4, https://secure.ssa .gov/apps10/reference.nsf/links/09302021025535PM (hereinafter "EM-20014 REV 4").

particular, roughly one-sixth of retirement-age SSI recipients are Black older adults.  Due to a combination of factors, Black recipients over age 62 must live on SSI payments 18 percent lower than those received by "all recipients."[7]  SSA's reduction of monthly benefits during the Public Health Emergency, therefore, disproportionately impacts older Black SSI recipients.

## II.   The Pandemic Has Precluded SSI Recipients from Effectively Communicating with SSA, Causing Many Recipients to Be Issued Overpayments.

Before the pandemic, millions of SSI recipients reported changes in their circumstances by visiting in person or calling their local field offices.  Compl. ¶ 42.  Some also reported changes by faxing or mailing information to SSA.  *Id.*  SSA also periodically reviews recipients' financial information through a "redetermination" process to make sure that they remain eligible for benefits.  *Id.* ¶ 44.  When a recipient is found to have exceeded the allowable SSI income or resource limits for one or more prior months, SSA determines that the recipient was "overpaid" for those month(s), sends a notice of overpayment (an "Overpayment Notice"), and schedules recoupment of benefits.  *Id.* ¶ 45 (citing 20 C.F.R. § 416.1336).[8]

SSA's decision that a recipient was overpaid can be made either manually (processed by a SSA employee) or automatically (processed through SSA's computer system, e.g., data matching from other government or private agency databases), with most overpayments assessed manually.  *Id.* ¶¶ 47–48.  The recipient has no control over which of these two processes SSA uses, and SSA does not notify recipients as to which process it used to assess their overpayment. *Id.* ¶ 47.  To recoup allegedly overpaid funds, SSA reduces the recipient's benefits by 10% each

---

[7] Ex. A-08, OFF. OF RET. & DISABILITY POL'Y, RESEARCH AND STATISTICS, SOC. SEC. ADMIN.,  NOTE: AFRICAN AMERICANS:  DESCRIPTION OF SOCIAL SECURITY AND SUPPLEMENTAL SECURITY INCOME PARTICIPATION AND BENEFIT LEVELS USING THE AMERICAN COMMUNITY SURVEY 13 (2014).

[8] The Overpayment Notice is required to inform the recipient of the correct and incorrect amounts for each overpaid month, the number of months covered by the overpayment, the reason for the overpayment, and the recipient's appeal rights (including the right to file for a standard waiver of the alleged overpayment), among other information. 20 C.F.R. § 416.558 (1995).

6

month until the full balance of the overpayment is repaid. *Id.* ¶ 49 (citing 20 C.F.R. § 416.570).

A recipient who receives an Overpayment Notice may request a "standard" waiver—that is, a decision by SSA to waive recoupment of the purported overpayment.[9]  *Id.* ¶ 50 (citing 20 C.F.R. § 416.550).   Through this process, SSA may elect to waive an overpayment if the recipient can show: "(a) [t]he overpaid individual was without fault in connection with an overpayment, and (b) [a]djustment or recovery of such overpayment would: (1) [d]efeat the purpose of title XVI, or (2) [b]e against equity and good conscience, or (3) [i]mpede efficient or effective administration of title XVI due to the small amount involved." *Id.* ¶ 54 (quoting 20 C.F.R. § 416.550; *see also* 42 U.S.C. § 1383(b)(1); 20 C.F.R. § 416.552–54).   Recipients seeking a "standard" waiver must complete a 14-page form, Form SSA-632,[10] with numerous supporting documents, to request a waiver. The agency estimates it will take an average of two hours to complete Form SSA-632.[11]  The form cannot be submitted online; it must be sent to a recipient's local SSA office.[12] This "standard" waiver process existed long before the pandemic and is available for all overpayments.  20 C.F.R. § 416.550.

### A. In March 2020, SSA Closed Its Field Offices and Stopped Manually Processing Overpayments, Reducing SSI Recipients' Ability to Resolve Overpayment Issues.

As discussed above, in March 2020, SSA closed its field offices across the country in

---

[9] The standard waiver request may be filed at any time.  Ex. A-09, POMS SI 02220.017.  Upon receipt of a standard waiver request, SSA is required to stop recoupment while the local SSA office considers the waiver request.  Ex. A-10, POMS SI 02260.001.

[10] Ex. A-11, *Form SSA-632BK | Request for Waiver of Overpayment Recovery*, Soc. Sec. Admin., https://www.ssa.gov/forms/ssa-632.html (last visited Oct. 5, 2021) (hereinafter "Form SSA-632").

[11] Ex. A-12, Agency Information Collection Activities: Proposed Request and Comment Request, 86 Fed. Reg. 46897 (Aug. 20, 2021).

[12] *See* Ex. A-11, Form SSA-632.  SSA estimates on the bottom of this form that "it will take" a recipient "about 120 minutes to read the instructions, gather the facts, and answer the questions," but that estimate was made before the pandemic and accompanying widespread bank and other facility closures.  One former legal aid attorney has stated that, contrary to this estimate, she and one of her clients spent "upwards of 5–6 . . . hours preparing and following up on the standard waiver request forms"—and unlike the vast majority of recipients—she has "15 years of experience representing hundreds of people directly with SSA Field Offices on overpayment-related claims."  Ex. C, Declaration of Amy Marinacci ("Marinacci Decl."), ¶¶ 11, 13.

response to the pandemic, which had been critical points of contact for many SSI recipients.  *See* Compl. ¶¶ 5-6, 30, 60; Ex. D, Declaration of Yulahlia Hernandez ("Hernandez Decl."), ¶ 5.  In the preceding year alone, more than 43 million people visited SSA's offices to provide information concerning benefits, seek assistance, seek reconsideration, appeal an action, or otherwise engage with the Agency.[13]    Compl. ¶ 30.  Since this closure, SSA's written communications to SSI recipients have been unclear and unhelpful, and it is often difficult (and sometimes impossible) to communicate with SSA via telephone.  *See id.* ¶¶ 121-34; Ex. E, Declaration of Peter Grieser ("Grieser Decl."), ¶¶ 7-10; Ex. D, Hernandez Decl., ¶ 5; Ex. C, Marinacci Decl., ¶ 6; Ex. F, Declaration of Katharine Vengraitis ("Vengraitis Decl."), ¶ 9.  Importantly, mail has not been reliably delivered by the Postal Service or timely opened or processed by SSA because SSA staff are working remotely.[14]    Compl. ¶ 63. Standard overpayment waivers, discussed *supra* pp. 6-7, also cannot be submitted online; instead, such waiver requests must be printed and submitted to a local office.

The results of these difficulties are twofold: not only are SSI recipients more likely to accrue overpayments because they struggle to manage their finances or cannot timely report changes in income or assets during the pandemic, but they are also less likely to be able to resolve any alleged overpayments.

In March 2020, SSA also stopped manually processing overpayments while the Agency determined how its employees would work remotely.  Compl. ¶ 65.  This meant that SSA did not act on overpayments even where the recipient had duly notified SSA of the relevant facts.  *Id.*

---

[13] *See* Ex. A-13, OFF. OF INSPECTOR GEN., SOC. SEC. ADMIN., CONGRESSIONAL RESPONSE REPORT, OFFICE OF INSPECTOR GENERAL, THE SOCIAL SECURITY ADMINISTRATION'S FIELD OFFICE CUSTOMER SERVICE 9 (2020).

[14] In fact, on July 29, 2021, the Office of Inspector General released an interim report that found half of field office managers reported being overwhelmed by mail duties, and twenty percent stated they have been unable to keep up with processing mail. Ex. A-14, *The Social Security Administration's Processing of Mail and Enumeration During the COVID-19 Pandemic* (July 29, 2021), available at https://oig-files.ssa.gov/audits/full/A-08-21-51036Interim Report.pdf (last accessed Oct. 22, 2021).

¶ 67.   During this period, SSA also paused redeterminations, eliminating yet another usual avenue for recipients to report changes impacting their benefit amounts.  *Id.* ¶ 66.  As a result of this pause, when SSA later sought to recover overpayments, the period covered by the overpayment was longer, through no fault of the recipient.  *Id.* ¶ 68.  This has unfairly led to overpayments being greater than they would have been had SSA timely processed the information in its possession.  *Id.*

**B. In August 2020, SSA Promulgated a Flawed Interim Final Rule to Address Overpayment Issues Resulting From Its Pandemic Response.**

On August 27, 2020, SSA issued the Interim Final Rule ("IFR").[15]  Compl. ¶ 69. SSA recognized that certain "overpayment debts . . . *occurred because of the circumstances surrounding the COVID–19 national public health emergency.*"  *Id.* (quoting IFR at 52,909 (emphasis added)).   The IFR states: "The combination of the pandemic and our necessary response to it has created a set of circumstances unlike any other in the history of our programs. This unique situation affects a number of our beneficiaries and, more importantly, affects them in a uniformly detrimental manner primarily due to our reprioritizing workloads to suspend the manual processing of certain actions," that is, overpayments.  *Id.* ¶ 70 (quoting IFR at 52,910). The IFR "assume[s] that these debts are not the fault of the affected beneficiaries due directly to [SSA's] strategic decision to reprioritize workloads to stop manual processing certain actions, and it would be against equity and good conscience to collect them."  *Id.* ¶ 71 (quoting IFR at 52,909).   One of the goals of the rule was to "ensur[e] that affected beneficiaries are not disadvantaged by [SSA's] actions during this unprecedented national public health emergency." *Id.*

The IFR thus provides a "simplified waiver process" (separate and apart from the

---

[15] Ex. A-15, 85 Fed. Reg. 52,909 (the "IFR").

standard process discussed *supra* pp. 6-7), referred to herein as the "streamlined waiver." *Id.* ¶ 72 (quoting IFR at 52,910). Unlike the standard waiver, the streamlined waiver requires that SSA "will presume overpaid individuals are without fault in having caused the qualifying overpayment debt;" "will determine that recovery of . . . qualifying overpayment debt incurred during the pandemic period would be against equity and good conscience;" and thus "will waive recovery of the portion of qualifying overpayment debt incurred during the pandemic period." *Id.* ¶ 73 (quoting IFR at 52,910).[16] Additionally, the IFR requires that SSA's field offices use a "streamlined process" to accept requests for waiver to "more efficiently administratively process qualifying overpayment debts and provide relief in a timely fashion." *Id.* ¶ 74 (quoting IFR at 52, 910). Under the "streamlined process," recipients are not "required to complete the full Form SSA-632 or provide supporting information about his or her income and expenses to make the waiver determination for the qualified debt." *Id.*

The IFR considers an overpayment to be "qualifying" only if: (1) the overpayment accrued at any point between March 1, 2020, and September 30, 2020 (SSA's so-called "pandemic period"); (2) the overpayment was identified by SSA by December 31, 2020; (3) the overpayment was processed manually rather than automatically; and (4) the recipient has requested a waiver of the overpayment. *Id.* ¶ 75 (citing IFR at 52,910). The IFR also ignores recipients' inability to submit documentation due to pandemic conditions. Each of these limitations is arbitrary, as set forth *infra* Argument § I(B).

### C. SSA's Implementation of the IFR Has Also Been Flawed, Including That the Overpayment Notice Fails to Give Meaningful Guidance to SSI Recipients.

Even for individuals whose overpayments are covered by the IFR, SSA has failed to

---

[16] While the IFR provided a presumption that recipients were without fault, and stated that SSA would "not fully develop the issue of fault," the IFR maintained a "limited exclusion[] . . . for overpayment debts that resulted from fraud or similar fault or misuse of benefits by a representative payee." IFR at 52,912.

properly implement the streamlined waiver process per the specifications of the IFR.  SSA has regularly refused to allow recipients to submit streamlined waiver requests by telephone, which the IFR permits.  For those who have been able to submit requests, SSA has often said that the overpayments did not qualify without explaining what criteria had not been met.  Compl. ¶¶ 103–04.  Worse still, notwithstanding that the IFR expressly states that recipients need not fill out the standard waiver form (SSA-632), SSA has regularly required recipients requesting a streamlined waiver under the IFR to submit that lengthy form with accompanying documentation.  *Id.* ¶ 105; Ex. G, Declaration of Linda Landry ("Landry Decl."), ¶ 6A; Ex. F, Vengraitis Decl., ¶ 7; Ex. H, Declaration of Amy Walters ("Walters Decl."), ¶ 8.  Many SSA employees seem to have not known about the streamlined waiver at all.  *See* Compl. ¶¶ 159, 161; Ex. H, Walters Decl., ¶¶ 8-9; Ex. G, Landry Decl., ¶ 6; Ex. C, Marinacci Decl., ¶ 9; Ex. D, Hernandez Decl., ¶ 7. SSA also issued sub-regulatory guidance that improperly curtailed the overpayment debts to which the IFR would be applied, even beyond the limited categories already set forth in the IFR itself.[17]

After the IFR was issued, SSA's modified Overpayment Notices also failed to conform to the IFR.  Compl. ¶ 121.  The Overpayment Notices, as revised, contain a "SPECIAL MESSAGE FOR OVERPAYMENTS BETWEEN MARCH AND SEPTEMBER 2020," which states:

> We [are] temporarily suspending processing and collection of some overpayments between March and September 2020.  We did this because of the national public health emergency caused by the coronavirus (COVID-19) pandemic.  If you were overpaid between March and

---

[17] Specifically, Ex. A-16, EM-20037 SEN REV, effective November 19, 2020, limited the IFR's protections to overpayments that were coded in a particular way in SSA's computer system—e.g., it applied to only those overpayments coded as "CV19" or "318" in certain fields.  Compl. ¶¶ 108-10.  The IFR, as published, did not reference or require specific codes.  *Id.* ¶ 111.  SSA has since issued a second Emergency Message ("EM"), *see* Ex. A-17, EM-20037 SEN REV 2, effective March 16, 2021, and a third EM, *see* Ex. A-18, EM-20037 SEN REV 3, effective June 25, 2021 (currently in effect), but that guidance has failed to meaningfully improve SSA's handling of requests for waivers.  Moreover, even after issuing the third EM, SSA did not instruct its employees to re-review accounts that had previously been determined to not qualify for the IFR's streamlined waiver.  Compl. ¶ 120.

> September 2020, you may request a waiver, and we may find that you do
> not have to repay some or all of the overpayment.  Please contact your
> local Social Security office by phone to request a waiver.  You can find
> the telephone number for your local office below in this letter.

*Id.* ¶ 122; *see also* Exhibits I-05, I-06, I-09, I-11, I-15 to Ex. I, Declaration of Rachael Funk

("Funk Decl.").   The Overpayment Notices also contain standard language included in pre-

pandemic notices, including:

- "For us to waive the collection of the overpayment, two things have to be true:  It
  wasn't your fault that you got too much SSI money <u>AND</u> Paying us back would mean
  that you can't pay your bills for food, clothing, housing, medical care or other
  necessary expenses, or it would be unfair for some other reason."

- "You can ask for waiver at any time by completing the waiver form and returning it
  to us.  The form is called 'Request for Waiver of Recovery or Change in Repayment
  Rate,'" Form SSA-632.

  If you have any questions, please: . . . . Write or visit any Social Security office. If
  you plan to visit an office, you may call ahead to make an appointment. The office
  that serves your areas is located at:  [address].  Please have this letter with you if you
  call or visit an office."

Compl. ¶ 123; Ex. I-09; Ex. I-15.  These Notices fail to adequately inform recipients of their

rights and are seriously flawed in failing to conform to the IFR (e.g., improperly requiring a

Form SSA-632 to be submitted to SSA) and in advising recipients to visit a local field office that

has been closed since March 2020.  Compl. ¶¶ 124–34.

## III.    Facts Concerning the Four Named Plaintiffs

This case is brought by four Named Plaintiffs on behalf of themselves and a class of

similarly situated SSI recipients.   The facts regarding these four Named Plaintiffs are

summarized below and set forth at Compl. ¶¶ 135–293 and in the declarations of the Named

Plaintiffs and of Rachael Funk submitted in support of this Motion.

**A.  LaQuana Campos and Her Minor Child K.C.**

Facts relating to Named Plaintiffs LaQuana Campos and her child K.C. are set forth in Compl. ¶¶ 135–188; Ex. I, Funk Decl., ¶¶ 8–30; Ex. J, Declaration of Named Plaintiff LaQuana Campos ("Campos Decl.").

Thirty-six-year-old LaQuana Campos lives in Fort Greene, Brooklyn, with her husband, her 15-year-old child K.C, and two other children. Ms. Campos relies on the SSI benefits she and K.C. each receive to pay for part of the household's rent and food and additional monthly expenses. When Mr. Campos lost his job at the beginning of the COVID-19 pandemic, he began receiving state and federal unemployment benefits.

From September 9, 2020, through March 9, 2021, SSA sent K.C. multiple Overpayment Notices, each stating that she was overpaid in certain months between June and November 2020. SSA additionally sent K.C. a series of contradictory notices, first stating that for part of 2020, due to an increase in income, she should not have been receiving benefits and would no longer receive benefits; then reinstating some of those payments; then reducing a future payment; then terminating her benefits in December 2020; then stating that her Medicaid benefits would be terminated; and then stating SSA would be withholding $79.40 per month beginning in June 2021 as recoupment for K.C.'s overpayment. K.C. indeed had $79.40 withheld from her SSI benefits in June and July 2021.

From October 27, 2020, through August 26, 2021, SSA sent Ms. Campos four separate Overpayment Notices, each stating that she was overpaid in certain months between April 2020 and March 2021.  SSA additionally sent Ms. Campos a series of contradictory notices, first stating that for part of 2020, due to an increase in Mr. Campos's income, she should not have been receiving benefits; then stating SSA would be withholding $79.40 per month beginning in June 2021 as recoupment for her "overpayment;" then partially reinstating the purported

13

improper 2020 payments but identifying a 2021 overpayment. Ms. Campos indeed had $79.40 withheld from her SSI benefits in June and July 2021.

At least some of the income identified by SSA was actually Mr. Campos's unemployment benefits, which under SSA policy do not count as income for SSI purposes during the pandemic period,[18] but such benefits were improperly counted.

On October 2, 2020, the New York Legal Assistance Group (NYLAG), a non-profit provider of free legal services, filed a request for reconsideration due to SSA's error in considering Mr. Campos's unemployment income. SSA reversed the termination of K.C.'s SSI, which led to a reversal of her termination of Medicaid benefits as well.

On November 30, 2020, NYLAG submitted to SSA requests for streamlined waivers of certain of K.C.'s and Ms. Campos's overpayments. They have still not received decisions on these waiver requests.

Under the IFR, Ms. Campos cannot apply for a streamlined waiver of certain other of her and K.C.'s overpayments because, on information and belief, SSA identified them after December 31, 2020. She also cannot apply for a streamlined waiver of her overpayment for October 2020 through March 2021 or of K.C.'s overpayment for October and November 2020, both of which occurred after the IFR's September 2020 cutoff.

As a result of SSA's actions, Ms. Campos has struggled to provide basic resources for her family and is behind on multiple bills, leading to her phone service being cut off. She has suffered extreme stress, including panic attacks, exacerbating her physical health problems and leading to multiple hospitalizations.

---

[18] *See* Ex. A-06; Ex. A-07.

### B. Tosha Adams

Facts relating to Named Plaintiff Tosha Adams are set forth at Compl. ¶¶ 189–225; Ex. I, Funk Decl., ¶¶ 31–39; Ex. K, Declaration of Named Plaintiff Tosha Adams ("Adams Decl.").

Fifty-one-year-old Tosha Adams resides in East New York, Brooklyn, with two minor children she adopted from foster care. Until December 2020, Ms. Adams received SSI income, which she relied on to pay for her rent, food, utilities, and other monthly expenses. For years, Ms. Adams has also received approximately $2,700 in a monthly Adoption Assistance subsidy from the Administration for Children's Services to cover the children's expenses. Ms. Adams does not use these funds for her own expenses.

At the beginning of the COVID-19 pandemic, Ms. Adams spent less of the adoption subsidy than usual per month because the children's costs decreased when they were all locked down together in their apartment. Because Ms. Adams had been receiving the children's adoption subsidy for years, she did not think that it affected her SSI and did not report it to SSA.

SSA sent Ms. Adams an Overpayment Notice and Notice of Planned Action on or about November 16, 2020, stating that she had been over the $2,000 resource limit since March 2020[19] and so should not have been receiving SSI benefits, and that she would no longer receive benefits. Ms. Adams indeed has received $0 in SSI benefits since November 2020.

The resources identified by SSA were actually the accrued adoption assistance funds, which under SSA policy do not count as income or resources for SSI purposes. *See* POMS SI 01320.001 and SI 00830.415.

On December 30, 2020, Ms. Adams called the number listed on the Overpayment Notice and requested a waiver *pro se*. Her request was denied. In June 2021, Ms. Adams requested

---

[19] On information and belief, the Overpayment Notice also stated that Ms. Adams had an overpayment for months prior to March 2020, going back to late 2018.

reconsideration of her overpayment due to SSA's error in considering her adoption benefits. Ms. Adams sought legal assistance from NYLAG in July, and on August 24, 2021, NYLAG filed an additional reconsideration request on her behalf. Ms. Adams has still not received a decision on either reconsideration request.

Under the IFR, Ms. Adams cannot apply for a streamlined waiver of her overpayment for October and November 2020, which occurred after the IFR's September 2020 cutoff. She was not notified of her eligibility to apply for a streamlined waiver with respect to her overpayment for March through September 2020, which is eligible under the current IFR.

As a result of SSA's actions, Ms. Adams is behind on multiple bills and she has received shutoff notices for multiple utilities. She has also suffered extreme stress, including panic attacks, exacerbating her physical health problems and leading to multiple hospitalizations.

### C. Norman Marsh

Facts relating to Named Plaintiff Norman Marsh are set forth at Compl. ¶¶ 226–52; Ex. I, Funk Decl., ¶¶ 40–47; Ex. L, Declaration of Named Plaintiff Norman Marsh ("Marsh Decl.").

Norman Marsh is 73 years old and lives in the Bronx. Mr. Marsh relies on his SSI income to pay for his rent, food, utilities, and other monthly expenses. When he lost his job at the beginning of the COVID-19 pandemic, Mr. Marsh began also receiving unemployment benefits.

In February 2021, SSA sent Mr. Marsh an Overpayment Notice and Notice of Planned Action, stating that he had been overpaid a total of $5,756.68 in 2020 and 2021 and would no longer receive SSI benefits. Mr. Marsh indeed received $0 in SSI benefits in March 2021. At least some of the $3,128 in "monthly income" identified by SSA was actually a lump-sum payment of Mr. Marsh's unemployment benefits, which under SSA policy do not count as income for SSI purposes during the pandemic period. *See* Ex. A-06 (EM-21050 REV); Ex. A-07

(EM-20014 REV 4). Mr. Marsh requested reconsideration of SSA's actions on this basis. He has still not received a decision.

On March 12, 2021, SSA raised Mr. Marsh's SSI benefits to $529 per month but stated that it would be withholding $79 per month as recoupment for his "overpayment." Mr. Marsh indeed had $79 withheld from his SSI benefits in both April and May 2021.

Under the IFR, Mr. Marsh cannot apply for a streamlined waiver of his 2020 overpayment because, on information and belief, SSA identified it after December 31, 2020. He also cannot apply for a streamlined waiver of his overpayment for October 2020 through February 2021, which occurred after the IFR's September 2020 cutoff.

As a result of SSA's actions, Mr. Marsh is in arrears on his rent and delinquent on multiple bills, causing him significant stress and anxiety.  On or about October 11, 2021, SSA sent Mr. Marsh a notice of Change in Payment informing him that his benefits were retroactively increased starting in January 2021.  However, the notice did not clarify whether any decision has been made on Mr. Marsh's request for reconsideration of his overpayment for the period April 2020 through December 2020.

### D.  Betti Rodnyanskaya

Facts relating to Named Plaintiff Betti Rodnyanskaya are set forth at Compl. ¶¶ 253–93; Ex. I, Funk Decl., ¶¶ 48–58; Ex. M, Declaration of Named Plaintiff Betti Rodnyanskaya ("Rodnyanskaya Decl.").

Eighty-two-year-old Betti Rodnyanskaya relies on SSI and the Supplemental Nutrition Assistance Program (SNAP) as her sole sources of income. She pays for her rent, utilities, food, and other monthly expenses with her SSI income.

17

Following the guidance of the CDC and New York Government,[20] and out of concerns about COVID exposure, Ms. Rodnyanskaya and her family rarely left home from February through April 2020, and so her son-in-law was unable to withdraw money from her account for her as usual. As a result, her account balance temporarily exceeded the $2,000 limit. When he was able to periodically withdraw money after that, he did not withdraw enough to bring the balance back below the $2,000 maximum. Ms. Rodnyanskaya was not able to report her change in resources to SSA both because she does not manage her bank account and therefore was not aware that her resources exceeded $2,000, and she did not know how to contact SSA while its offices were closed.

SSA sent Ms. Rodnyanskaya an Overpayment Notice and Notice of Change in Payment on February 24, 2021, stating that she had been over the $2,000 resource limit in March through October 2020 and January through February 2021[21] and so should not have been receiving SSI benefits during those periods. The notice stated that SSA would be withholding $79.40 of her benefits per month starting in May 2021 as recoupment for her "overpayment." Ms. Rodnyanskaya indeed has had $79.40 withheld from her SSI benefits every month since May 2021.

On June 14, 2021, NYLAG filed a request on Ms. Rodnyanskaya's behalf for a waiver of her overpayment.  In October 2021, SSA repaid Ms. Rodnyanskaya for the benefits that had been recouped from her since the filing of her waiver request.  To the best of her knowledge, SSA has not made a determination on the granting of that waiver request.

---

[20] *See, e.g.*, Ex. A-19, *Mayor DeBlasio Issues New Guidance to New Yorkers,* NYC Gov. (Mar. 20, 2020), https://www1.nyc.gov/office-of-the-mayor/news/173-20/mayor-de-blasio-issues-new-guidance-new-yorkers.
[21] The Overpayment Notice also stated that Ms. Rodnyanskaya had overpayments for March, April, and November 2019.

18

Under the IFR, Ms. Rodnyanskaya cannot apply for a streamlined waiver of her overpayment because, on information and belief, SSA identified it after December 31, 2020. She also cannot apply for a streamlined waiver of her overpayment for October 2020 and January and February 2021, which occurred after the IFR's September 2020 cutoff.

As a result of SSA's actions, Ms. Rodnyanskaya has suffered significant stress, exacerbating her mental health conditions.

## ARGUMENT

I.   **Named Plaintiffs and Putative Class Members' Motion for a Preliminary Injunction Should Be Granted.**

While the Court considers the merits of this litigation, Named Plaintiffs and the class seek a class-wide preliminary injunction that would require SSA to pause assessing and recouping overpayments incurred during the pandemic.  This pause is basically the same as the overpayment policy that SSA issued at the beginning of the COVID-19 National Emergency, but this motion covers not only manually processed overpayments, but also automatically processed overpayments.  When seeking a preliminary injunction, the "moving party must show, first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) both "a serious question going to the merits to make them a fair ground for trial" and "a balance of hardships tipping decidedly in plaintiff's favor." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 33 (2d Cir. 2010) (citations omitted); *see also Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004).

Here, both prongs are undoubtedly met, whether under the "likelihood of success on the merits" standard or the less rigorous "serious question/balance of hardships" standard.[22]   In

---

[22] Because this motion asks for virtually the same overpayment assessment and recoupment pause that was instituted by SSA in March 2020, this Court should apply the "serious question/balance of the hardships" standard.  However,

particular, preliminary relief under Federal Rule of Civil Procedure 65 is an appropriate remedy in cases involving the deprivation of a right secured by the laws of the United States, including claims that individuals have been deprived of public benefits to which they are entitled.  *See, e.g.*, *Reynolds v. Giuliani*, 35 F. Supp. 2d 331 (S.D.N.Y. 1999) (issuing preliminary injunction to prevent improper denial of food stamp, Medicaid, and public assistance applications).  So too here.

Further, courts routinely issue preliminary injunctions to help restore the status quo during the pendency of litigation, which is what this motion seeks with respect to the proposed class-wide injunction.  *See, e.g.*, *Mastrio v. Sebelius*, 768 F.3d 116, 120–21 (2d Cir. 2014) (TRO reinstating insurance coverage shortly after termination "was simply a return to the status quo," noting that "[t]he 'status quo' to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy.") (internal quotations omitted); *Regents of the Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1049–50 (N.D. Cal. 2018) (granting plaintiffs' preliminary injunction of government's rescission of DACA program and ordering program reinstated on the same terms and conditions as were in effect before unlawful government action).  Here, the "last actual, peaceable uncontested status" is that SSI recipients (at least those whose overpayments were processed manually) received their benefits without interruption in mid-2020.

Finally, it is appropriate for Named Plaintiffs and the class to seek systemic injunctive relief.  "[T]he national character of an APA violation ordinarily demands a national remedy"; in such circumstances, "[l]imiting a preliminary injunction to the parties would not adequately protect the interests of all stakeholders." *Saget v. Trump*, 375 F. Supp. 3d 280, 379 (E.D.N.Y.

---

even if the Court determines that the "likelihood of success on the merits" standard instead applies, as described in this memorandum, Named Plaintiffs meet that standard as well.

2019) (quotation marks and citation omitted).[23]  Such systemic injunctive relief ordering SSA to return to pre-Rule practices at the beginning of the pandemic is appropriate here while the case proceeds on the merits.

## A. Named Plaintiffs and Putative Class Members Have Suffered and Will Continue to Suffer Irreparable Harm Unless the Preliminary Relief Is Granted.

The Second Circuit considers "a showing of irreparable harm to be the most important prerequisite for the issuance of a preliminary injunction." *Nat'l Ass'n for the Advancement of Colored People v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995); *accord Reynolds*, 35 F. Supp. 2d at 339.  Also, the Second Circuit "has long . . . recognized that protracted denial of subsistence benefits constitutes irreparable harm."  *Islam v. Cuomo*, 475 F. Supp. 3d 144, 153 (E.D.N.Y. 2020); *see also Hurley v. Toia*, 432 F. Supp. 1170, 1176 (S.D.N.Y. 1977) (internal quotations omitted), *aff'd*, 573 F.2d 1291 (2d Cir. 1977) (erroneous denial of public benefits results in "extreme and very serious damage" that constitutes irreparable harm); *Becker v. Toia*, 439 F. Supp. 324, 336 (S.D.N.Y. 1977) (issuing preliminary injunction to prevent reductions in Medicaid benefits).  For recipients of subsistence benefits, the "loss of even a small portion of"

---

[23] *See also California v. U.S. HHS*, 941 F.3d 410, 419–20 (9th Cir. 2019) (issuing preliminary injunction based on likelihood of success on a procedural APA claim); *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 960 (N.D. Cal. 2019) ("Defendants are hereby ORDERED AND ENJOINED, pending final judgment herein or further order of the Court, from taking any action continuing to implement the Rule and ORDERED to return to the pre-Rule practices for processing asylum applications."); *Rosetti v. Sullivan*, 788 F. Supp. 1380 (E.D. Pa. 1992) ("Although the Court may not be jurisdictionally empowered to compel the Secretary to exercise his discretion, it can enjoin the Secretary from evaluating disability claims on the basis of invalid substantive rules."), *finding case not moot on appeal, Rosetti v. Shalala*, 12 F.3d 1216, 1233 (3d Cir. 1993), *on remand stipulation including PI relief*, *Rosetti v. Shalala*, No. 91-3389, 1994 WL 655803, at *2–3 (E.D. Pa. June 30, 1994).

Furthermore, the Court possesses broad authority to fashion injunctive relief to best address SSA's violations as established at trial.  *See U.S. v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496 (2001) ("When district courts are properly acting as courts of equity, they have discretion unless a statute clearly provides otherwise.  For 'several hundred years,' courts of equity have enjoyed 'sound discretion' to consider the 'necessities of the public interest' when fashioning injunctive relief."); *see also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("Traditional administrative law principles may also be relevant in addressing the claim that named plaintiffs alone should be protected by the injunction.  When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual is proscribed."); *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*).

the funds "can constitute irreparable injury warranting issuance of a preliminary injunction." *Morel v. Giuliani*, 927 F. Supp. 622, 635 (S.D.N.Y. 1995). Deprivation of the "very means by which to live" simply "cannot be rectified through the payment of benefits at a later date." *Olson v. Wing*, 281 F. Supp. 2d 476, 486 (E.D.N.Y.), *aff'd*, 66 F. App'x 275 (2d Cir. 2003) (citations omitted); *see also Cincotta v. N.Y.C. Hum. Res. Admin*., No. 00 Civ., 9064(JGK), 2001 WL 897176, at *12 (S.D.N.Y. Aug. 9, 2001); *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 209 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003).

As discussed above, the proposed Plaintiff Class relies on SSI for survival and has very limited income and resources; therefore, SSI benefits are an essential source of support that provides putative class members with the barest means of survival. *See* Ex. J, Campos Decl., ¶¶ 3, 7, 10, 23; Ex. K, Adams Decl., ¶¶ 3, 23, 24; Ex. L, Marsh Decl., ¶¶ 3, 11; Ex. M, Rodnyanskaya Decl., ¶¶ 6, 24. The proposed Plaintiff Class lives in conditions of poverty, and a recoupment for overpayment, which takes the form of a 10% reduction in a recipient's monthly benefits, is severe to persons living on the edge during a pandemic, and has the potential to disrupt the recipient's access to food and housing. 20 C.F.R. § 416.570. Every day that putative class members live without their full public benefits is a day of "brutal need," causing physical and emotional injury that cannot be compensated with later payments or other monetary awards. *See Goldberg v. Kelly*, 397 U.S. 254, 260–65 (1970). This wrongful deprivation constitutes irreparable injury.

The pandemic presents particularly heightened risks for SSI recipients, who are disabled, elderly, or both disabled and elderly. Named Plaintiffs and putative class members have faced, and are facing, significant stress and hardship, including food insecurity, due to improper overpayments being assessed during the ongoing and worsening pandemic. There is no doubt

22

that the Named Plaintiffs and putative class members will continue to suffer irreparable harm if SSA does not refrain from assessing and recouping overpayments that accrued under pandemic conditions.  All four Named Plaintiffs rely on their SSI benefits to pay for their basic needs, including rent, food, utilities, and other monthly expenses.  *See* Ex. J, Campos Decl., ¶¶ 3, 7, 10, 23; Ex. K, Adams Decl., ¶¶ 3, 23, 24; Ex. L, Marsh Decl., ¶¶ 3, 11; Ex. M, Rodnyanskaya Decl., ¶¶ 6, 24.  All four have suffered significant stress and anxiety as the result of SSA's actions, which for three Named Plaintiffs has exacerbated existing physical and mental health conditions, and for two has led to multiple hospitalizations. *See* Ex. J, Campos Decl., ¶ 24; Ex. K, Adams Decl., ¶ 25; Ex. L, Marsh Decl., ¶ 11; Ex. M, Rodnyanskaya Decl., ¶¶ 4, 24.  Three Named Plaintiffs were unable to pay their bills because of SSA's actions, and two were told their utilities would be shut off for nonpayment.  *See* Ex. J, Campos Decl., ¶ 23; Ex. K, Adams Decl., ¶ 24; Ex. L, Marsh Decl., ¶ 11.  Moreover, the majority of the Named Plaintiffs are at particularly high risk during the ongoing COVID-19 pandemic, given the documented racial disparities in COVID-19 infection rates and case mortality among low-income Black and Latino individuals.[24]

### B.  Named Plaintiffs and Putative Class Members Are Likely to Succeed on the Merits.

Named Plaintiffs and the class are likely to succeed on the merits of each claim that the IFR is arbitrary and capricious, violated recipients' due process rights, and excluded similarly situated class members from obtaining a streamlined waiver, and therefore also present serious questions going to the merits.

The IFR is arbitrary, capricious, and an abuse of discretion.  IFRs that have already gone into effect constitute final agency action: "[t]he key word in the title 'Interim Final Rule' . . . is not interim, but *final*.  'Interim' refers only to the Rule's intended duration—not its tentative

---

[24] Ex. A-20, *COVID-19's Socioeconomic Impact on Low-Income Benefit Recipients: Early Evidence from Tracking Surveys*, 6 Socius 1 (2020) (DOI 10.1177/2378023120970794).

nature." *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1268 (D.C. Cir. 1996) (considering open request for public comment immaterial); *accord California v. Azar*, 911 F.3d 558, 580–81 (9th Cir. 2018).  Interim final rules undoubtedly "carry[] the force of law." *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 226 (2d Cir. 2021) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 227, 230–31 (2001)).  Therefore, they constitute "final agency action." *See New York v. U.S. E.P.A.*, 350 F. Supp. 2d 429, 434–35 (S.D.N.Y. 2004), *aff'd sub nom. Nat. Res. Def. Council v. Johnson*, 461 F.3d 164 (2d Cir. 2006).

Challenges to "the reasonableness of [an agency's] actions" are governed by the "arbitrary and capricious" standard.  *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 324 (2d Cir. 2003); *see also Heckler v. Campbell*, 461 U.S. 458, 466 (1983) ("regulations promulgated" by SSA are reviewed for whether they "exceeded the Secretary's statutory authority and whether they are arbitrary and capricious"); *Bowen v. Yuckert*, 482 U.S. 137, 145 (1987) (same); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993) (same).  Under that standard, a reviewing court will "ask whether the agency has . . . 'articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Waterkeeper All., Inc. v. U.S. E.P.A.*, 399 F.3d 486, 498 (2d Cir. 2005) (quoting *Motor Vehicle Mfrs.' Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)).  The court will find the agency action arbitrary and capricious where "there has been a clear error of judgment": i.e., "where 'the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Id.* (quoting *State Farm*, 463 U.S. at 43).

Here, the IFR imposed a number of arbitrary and capricious limitations, which are

discussed below.  The IFR also violated SSI recipients' equal protection and due process rights.

**1. The IFR's So-Called "Pandemic Period" Definition Is Arbitrary and Capricious.**

The IFR's definition of the "Pandemic Period"—March 1, 2020 through September 30, 2020—is arbitrary and capricious in and of itself.  *First*, as noted above, an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 42–43 (internal quotation marks omitted); *accord Waterkeeper All., Inc.*, 399 F.3d at 498.  Here, SSA defines its narrow "Pandemic Period" as the time period in which the agency "reprioritize[ed] workloads [and] suspend[ed] the manual processing of certain actions," including "collecting certain overpayment debts."  IFR at 52,910.

But defining the "Pandemic Period" based on SSA's own operations is not grounded in reality since the actual pandemic continues to rage and continues to exert tremendous pressure on SSI recipients.  As this Court well knows, the Covid-19 National Emergency remains ongoing (and unfortunately is showing no signs of slowing down).  In fact, there have been significantly *more* Covid-19 infections and deaths in the U.S. *after* the September 30, 2020 cutoff used by SSA for the "pandemic period" than there were during that defined period.[25]  Moreover, this definition of "pandemic period" conflicts with the definition used by SSA itself in other policy announcements.[26]  Under other policy announcements, SSA acknowledges the pandemic period is still ongoing and linked to the pandemic period as determined by the Federal Emergency

---

[25] Specifically, the CDC identified 7,383,740 new cases between March 1, 2020, and September 30, 2020, but 37,714,460 new cases between October 1, 2020, and October 20, 2021.  *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid .cdc.gov/covid-data-tracker/#trends_totalcases (last accessed Sept. 10, 2021) (using "Cumulative Cases" as left axis variable).  Similarly, the CDC identified 214,325 deaths between March 1, 2020, and September 30, 2020, but 515,033 deaths between October 1, 2020, and October 20, 2021. *Id.* (using "Cumulative Deaths" as left axis variable).

[26] *See* Ex. A-06 (EM-21050 REV); Ex. A-07 (EM-20014 REV 4).

Management Agency's (FEMA) assessment.  Moreover, SSA has almost completely closed its own offices *because of the pandemic.*  Accordingly, there is no rational justification for the September 30, 2020 cut-off date used by SSA for the "pandemic period" in the IFR, and it should therefore be considered arbitrary and capricious because it excludes similarly situated individuals from receiving benefits based on circumstances outside their control.  *See Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 321 (4th Cir. 2021) ("[I]t is not only arbitrary and capricious, but also fundamentally unfair, for SSA to 'distinguish between similarly situated claimants based on circumstances entirely outside their control.'" (citation omitted)); *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 808 (6th Cir. 2018) (Agency's differing treatment of benefit recipients suspected of fraud by SSA vs. by OIG "distinguish[ed] between similarly situated claimants based on circumstances entirely outside their control" and thus likely "violate[d] the APA.").[27]

*Second*, agency action is arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem[.]" *See State Farm*, 463 U.S. at 42–43.  Here, in the very midst of the pandemic—August 2020—SSA arbitrarily decided that the pandemic for purposes of the IFR's streamlined waiver had ended, all while SSA's own offices across the country remained closed for most purposes due to the increasing threat of COVID-19. SSA failed to consider that SSI recipients would have just as much difficulty providing documentation and communicating with SSA in a remote environment after September 30, 2020 as it did prior

---

[27] *Cf. Miller v. Bond*, 641 F.2d 997, 1005 (D.C. Cir. 1981) (agency's failure to provide notice to employees that approval of sick leave required "evidence of 'objective' symptoms" meant that "whether a particular employee happened to submit the evidence deemed necessary to qualify for that category became a matter of sheer luck," and "[d]ecisions based on luck, rather than objective criteria, can only be described as 'arbitrary and capricious,' and therefore invalid."); *Vargas v. Meese*, 682 F. Supp. 591, 598 (D.D.C. 1987) (issuing a preliminary injunction when an "arbitrary deadline" imposed by INS to exclude certain migrant workers from making an immigration application "serves no purpose that the Court can determine"); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632 (1974) (concluding that "arbitrary cutoff dates embodied in [] mandatory leave rules … have no rational relationship to the valid state interest").

to that date.  SSA also failed to recognize that the same problems plaguing its own efficient operations (e.g., delays in mail delivery and timely processing of mail, adequate training on implementation of the IFR, etc.) would remain after September 30, 2020 as well.  SSA has failed to consider and account for the impact of the ongoing pandemic on recipients, and in doing so, has not considered an important aspect of the problem. There is simply no principled reason for SSA to draw this distinction, yet the entire IFR is premised on the pandemic conditions affecting SSI recipients for only a very short period of time.  This could not be further from reality.

This severe deficiency in the IFR was not, and is not, news to SSA.  In fact, in response to the IFR, numerous organizations and advocates submitted comments noting deficiencies and flaws in the Rule,[28] including comments from almost every commenting organization that the pandemic period needed to be extended beyond September 30, 2020.  For example, representatives from Bay Area Legal Aid pointed out that, while SSA may have begun to resume some operations on September 30, 2020, "working through a backlog that was six months in the making will take time" and will create further delays.[29] Furthermore, SSA recipients continue to struggle with "safe access to SSA Field Offices," people directly affected by COVID-19 can hardly "be expected to prioritize SSA reporting requirements."[30]   Multiple other commenters agreed.[31]   However, notwithstanding the extensive comments noting the IFR's deficiencies in

---

[28] *See generally* Comment Letters on Interim Final Rule on Waiver of Recovery of Certain Overpayment Debts Accruing during the Covid-19 Pandemic Period (Aug. 27, 2020), https://www.regulations.gov/document/SSA-2020-0045-0001/comment.

[29] Ex. A-21, Roselee Molloy, Bay Area Legal Aid, Comment Letter on Interim Final Rule on Waiver of Recovery of Certain Overpayment Debts Accruing during the Covid-19 Pandemic Period (Oct. 26, 2020), https://www.regulations.gov/comment/SSA-2020-0045-0030.

[30] *Id.*

[31] *See, e.g.*, Ex. A-22, Catherine Callery, Empire Just. Ctr. & Urb. Just. Ctr., Comment Letter on Interim Final Rule on Waiver of Recovery of Certain Overpayment Debts Accruing during the Covid-19 Pandemic Period (Oct. 26, 2020),  https://www.regulations.gov/comment/SSA-2020-0045-0027 ("While SSA may have resumed some workloads, its offices are still closed to the public and pursuit of 'usual' waiver process remains and will continue to remain burdensome."); Ex. A-23, Reps. Katie Porter & Mary Gay Scanlon, Comment Letter on Interim Final Rule on Waiver of Recovery of Certain Overpayment Debts Accruing during the Covid-19 Pandemic Period (Oct. 19,

myriad ways, SSA utterly failed to revise the Rule or issue further guidance that would address the unfair and unsubstantiated "pandemic period" definition.

### 2. The IFR's Requirement That a Qualifying Overpayment Must Have Been Identified by SSA by December 31, 2020, Is Arbitrary and Capricious.

There is no rational basis for conditioning the IFR's streamlined waiver upon SSA's identification of qualifying overpayments by December 31, 2020. The IFR provides: "For purposes of this interim final rule, we 'identify' an overpayment debt when we discover the overpayment debt and initiate action to recover it." IFR at 52,910. But circumscribing which recipients may take advantage of the streamlined waiver based on when the SSA *identifies* an overpayment—a factor over which the recipient has no control, and which has nothing to do with the criteria making any particular overpayment eligible for waiver—is plainly arbitrary. *See Kirk*, 987 F.3d at 321 ("[I]t is not only arbitrary and capricious, but also fundamentally unfair, for SSA to 'distinguish between similarly situated claimants based on circumstances entirely outside their control.'" (citation omitted)); *accord Hicks*, 909 F.3d at 808 (agency's "distinguish[ing] between similarly situated claimants based on circumstances entirely outside their control" likely "violate[d] the APA").

Take the example of two recipients with identical overpayments incurred in the same month for identical reasons. A recipient whose overpayment SSA identified on December 31, 2020, would benefit from the streamlined waiver process, while the recipient whose overpayment was discovered the very next day, on January 1, 2021, would not. Maintaining this

---

2020), https://www.regulations.gov/comment/SSA-2020-0045-0015 ("Overpayments because of workload shifts and other administrative delays caused by the pandemic will continue for months, if not longer.").

arbitrary distinction constitutes a "clear error of judgment." *See Waterkeeper All., Inc.*, 399 F.3d at 498.[32]

The distinction is also arbitrary and capricious in light of the justification provided for the IFR in the first place:

> As we process [] suspended workloads, we anticipate identifying a number of overpayments that we would have identified and acted on earlier <u>had it not been for our response</u> to the COVID-19 pandemic. <u>Because of our delay</u> in acting, it is probable that the resulting overpayment debts may be larger in amount and greater in number than they would otherwise have been <u>through no fault of the affected beneficiaries</u> . . . . IFR at 52,910 (emphasis added).

Accrual of an overpayment for more time due to SSA's delay is not the fault of the SSI recipient whether SSA identifies that overpayment before or after December 31, 2020. In fact, further delay lasting *beyond* December 31, 2020, actually imposes *greater* harm on the recipient than if SSA had identified and acted on their overpayment sooner.

These concerns were expressed by many commenters to the IFR. For example, AARP stated that "SSA [should] reconsider its December 31, 2020, deadline for identifying qualifying overpayments. . . . [because] all qualifying overpayments that occurred as a result of SSA's re-prioritization of work and through no fault of the beneficiary should be waived, regardless of when they are identified."[33] Justice in Aging ("JIA") also noted this deficiency. Since the SSA began processing backlogged workloads on September 1, 2020, the comments anticipated that the SSA would likely not identify all overpayments by December 31, 2020, and "beneficiaries

---

[32] *See also Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n*, 396 F. Supp. 3d 113, 121 (D.D.C. 2019):

> "It is axiomatic that the APA requires 'reasoned decision making.' That principle requires the Court to assess whether the agency considered 'the relevant factors and whether there was a clear error in judgment.' . . . In other words, although 'a court is not to substitute its judgment for that of the agency, neither may a court sanction agency action when the agency . . . fails to justify seeming inconstancies in its approach[.]'") (internal citations omitted).

[33] Ex. A-24, David Certner, AARP, Comment Letter on Interim Final Rule on Waiver of Recovery of Certain Overpayment Debts Accruing during the Covid-19 Pandemic Period (Oct. 26, 2020), https://www.regulations.gov/comment/SSA-2020-0045-0022.

who experience overpayments beyond the pandemic period as a direct result of the pandemic but are not processed by December 31, 2020 will not be able to benefit fully from the relief provided by the streamlined procedures."[34]

The only proffered justification for this temporal requirement is that "it limits the amount of time [SSA has] to apply two separate overpayment debt business processes; extending the period would exacerbate that operational issue."  IFR at 52,911.  In other words, it would be administratively difficult to operate two waiver systems simultaneously. This rationale is unsupported.  Even a well-articulated and credible claim of administrative burden is insufficient to justify such an arbitrary distinction, but the SSA's stated justification is neither well articulated nor credible.

Finally, Named Plaintiffs' experiences demonstrate precisely why the requirement that SSA identify the overpayment by December 31, 2020, is unworkable in practice.  For example, Named Plaintiff Norman Marsh received an Overpayment Notice—covering April through December 2020 and January through February 2021—on February 4, 2021, for the first time. Compl. ¶ 231.  With regard to the months falling within the Pandemic Period, April through September 2020, there is no question that Mr. Marsh qualifies for a streamlined waiver except for the fact that he was unlucky because *SSA* did not identify the overpayment in time. Similarly, Named Plaintiff Betti Rodnyanskaya received an Overpayment Notice for the first time on February 24, 2021, covering March through July 2020 and September through October 2020.  *Id.* ¶ 274.  Such unfairness in applying the IFR to SSI recipients is arbitrary, capricious, and an abuse of discretion.  *Hicks v. Comm'n of Soc. Sec.*, 909 F 3d 786, 809 (6th Cir. 2018)

---

[34] Ex. A-25, Tracey Gronniger, Just. in Aging, Comment Letter on Interim Final Rule on Waiver of Recovery of Certain Overpayment Debts Accruing during the COVID-19 Pandemic Period (Oct. 23, 2020), https://www.regulations.gov/comment/SSA-2020-0045-0017.

("Decisions based on luck . . . can only be described as 'arbitrary and capricious,' and therefore invalid.") (internal citations omitted).

3.   **The IFR Is Arbitrary and Capricious Because It Fails to Consider Ongoing Pandemic-Related Barriers to Submitting Information to and Obtaining Information from SSA.**

SSI recipients have faced, and continue to face, incredible challenges in communicating with and submitting documentation to SSA.  For example, certain of the Named Plaintiffs in this case communicated with SSA by visiting their local offices pre-pandemic and were unable to do so after March 2020.  *See* Compl. ¶ 138 (Ms. Campos and K.C.); Ex. J, Campos Decl., ¶ 5; Compl. ¶ 193 (Ms. Adams); Ex. K, Adams Decl., ¶ 5; *see also* Ex. B, Means Decl., ¶ 8. Attempting to communicate with and send documents to SSA via U.S. mail, fax, and phone also proved futile.  *E.g.*, Compl. ¶¶ 214–15 ("Ms. Adams attempted to mail and fax many different documents to SSA, but, based on later conversations with SSA representatives, believes that most of them were not received." & "Ms. Adams found it almost impossible to work effectively with the SSA representatives on the phone. Each time she called, she spoke to a different representative, who told her a different thing."); Ex. K, Adams Decl., ¶¶ 17–20; Compl. ¶ 271 ("Ms. Rodnyanskaya was scheduled for a recertification conference by telephone . . . . Her daughter . . . waited by the phone with her for hours, but SSA never contacted her.  After several hours, [her daughter] called SSA.  She was put on hold multiple times and was told that the SSA employee she spoke to could not see the recertification appointment in the SSA system."); Ex. M, Rodnyanskaya Decl., ¶¶ 17, 19; Ex. C, Marinacci Decl., ¶ 7; Ex. B, Means Decl., ¶ 8.[35]

---

[35] *See also* Ex. A-26, U.S. Rep. Dwight Evans, Comment Letter on Interim Final Rule on Waiver of Recovery of Certain Overpayment Debts Accruing during the Covid-19 Pandemic Period (Oct. 23, 2020), https://www.regulations.gov/comment/SSA-2020-0045-0018 ("SSA's teleservice centers continue to experience low average speed of answer and high busy rates[.]"; COVID limitations "make it difficult . . . for the agency to process reports of changes[.]"); Ex. A-27, Amy Walters, Legal Aid Just. Ctr., Comment Letter on Interim Final Rule on Waiver of Recovery of Certain Overpayment Debts Accruing during the COVID-19 Pandemic Period (Oct. 26,

Because of SSA's ongoing challenges in processing and responding to information provided by SSI recipients, many SSI recipients have been simply unable to tell SSA of changes in their income or assets, and have been assessed overpayments as a result. These overpayments are "not the fault of the affected beneficiaries," yet SSA excludes these beneficiaries from the streamlined waiver process provided by the IFR.  IFR at 52,909. The IFR was based on the idea that it was "against equity and good conscience to collect" overpayments from SSI recipients affected by SSA's pandemic-related pause in manually processing overpayments, but it is equally "against equity and good conscience to collect" overpayments caused by SSA's pandemic-related inability to timely process information about SSI recipients' changes in circumstances.  Therefore, SSA has not articulated a satisfactory explanation for excluding SSI recipients from streamlined waivers under the IFR when those recipients were unable to submit information about a change in circumstance to the SSA, or were unable to have that information timely processed during the Covid-19 National Emergency, and that exclusion constitutes a "clear error of judgment."  *See Waterkeeper All., Inc.*, 399 F.3d at 498.

### 4. The IFR Is Arbitrary and Capricious Because It Applies Only to Manually Processed Overpayments, Not to Automatically Processed Overpayments.

Additionally, the IFR applies only to overpayments that would typically be identified through SSA's "manual process" and not "overpayment debts that [SSA] identified through [its] automated processes."  IFR at 52,910.  This means—as the IFR itself acknowledged—that "even if beneficiaries incurred the debts during the [same] period and in the same manner," IFR at

---

2020),  https://www.regulations.gov/comment/SSA-2020-0045-0023  ("[S]imply trying to reach the appropriate personnel at SSA with the appropriate documentation can be immensely burdensome—between long wait times, technological difficulties, and workers inaccessible due to unmanageable caseloads, it is our experience that beneficiaries often cannot resolve their issues with a quick telephone call."); Ex. A-28, Barbara Silverstone, Nat'l Org. of Soc. Sec. Claimants' Representatives, Comment Letter on Interim Final Rule on Waiver of Recovery of Certain Overpayment Debts Accruing during the COVID-19 Pandemic Period (Oct. 7, 2020), https://www.regulations.gov/comment/SSA-2020-0045-0009 ("SSA's teleservice centers continue to experience low average speed of answer and high busy rates[.]").

52,910, some would be eligible for the streamlined waiver while others would not. Importantly, recipients have no control over whether SSA will review their eligibility through a "manual" or "automated" process, nor does an individual receiving an Overpayment Notice have any way of knowing whether the overpayment was processed manually or automatically because SSA does not provide that information.

Distinctions between manual and automatic processes are unrelated to the recipients or their claims and occur outside of the view of program participants. SSA's method of tying eligibility for the streamlined waiver to manual internal processes is arbitrary and capricious. *See Kirk*, 987 F.3d at 321–22 ("[T]reating similarly situated beneficiaries differently based solely on factors unrelated to the beneficiaries or their claims is the very definition of arbitrary and capricious agency action." (citations omitted)); *accord Hicks*, 909 F.3d at 808 (agency's "distinguish[ing] between similarly situated claimants based on circumstances entirely outside their control" likely "violate[d] the APA"). Recipients with automatically processed overpayments experience the same barriers to obtaining information from and submitting relevant eligibility information to SSA, and to obtaining information from other organizations that have eliminated in-person services, as do recipients with manually processed overpayments.

SSA has provided no rational reason as to why only some of a group of similarly situated recipients should be entitled to a streamlined waiver based on how SSA (and not those recipients) chose to process their paperwork behind the scenes.

### 5. Despite Having All Necessary Information to Waive Identified Overpayments, SSA Arbitrarily and Capriciously Requires Recipients to Affirmatively Request Relief.

The IFR, as written, entitles recipients who fall within its parameters to a no-fault presumption and streamlined waiver of covered overpayments. This streamlined process applies where the overpayment is processed manually by SSA (as opposed to through an automated

process), where the overpayment was incurred during the SSA-defined "pandemic period" (March 1, 2020, through September 31, 2020), and where SSA identified the overpayment by December 31, 2020. *See supra* Background § II(B). All of the aforementioned information is already in the hands of the agency. Nonetheless, SSA requires that recipients seeking the streamlined waiver affirmatively request a new type of waiver using a new process they know nothing about.

In operationalizing the streamlined waiver, SSA inexplicably sent Overpayment Notices (which were faulty, as detailed *infra* Argument § I(B)(6)) to SSI recipients who SSA already knew qualified for the streamlined waiver. Under these circumstances, it is both arbitrary and unfair to require recipients to take any affirmative steps to apply for a streamlined waiver, when the waiver should issue automatically. The Social Security Act does not require that recipients submit an application for a waiver. The Agency has an application process for the standard waiver because it needs to obtain information from recipients to establish the entitlement. By contrast, here, with the streamlined waiver, SSA has all the information it needs to determine who falls within the letter of its IFR. As such, SSA can and should automatically apply the streamlined waiver where they have all information in hand. SSA's additional requirement that recipients affirmatively apply for the streamlined waiver impermissibly adds an additional condition for obtaining relief. *Does v. Shapiro*, 302 F. Supp. 761, 764 (D. Conn. 1960) ("We hold, therefore, that the challenged regulation is invalid on the ground that it imposes an additional condition of eligibility not required by the Social Security Act[.]"); *see also Buckner v. Maher*, 424 F. Supp. 366, 373 (1976). While SSA offices remain largely closed, SSA recipients face significant hurdles in communication with SSA and thus are unlikely to be able to apply for a streamlined waiver even when all other criteria are met and the recipient is aware of

34

the opportunity to obtain a streamlined waiver.  These difficulties will remain even after reopening as SSA is likely to have a large backlog to work through.

As with all of the flaws in the IFR discussed above, SSA was well aware of this issue, as many commenters noted that it was unfair for SSA to require individuals to apply for waivers under these circumstances, and that SSA should instead grant automatic waivers.  For example, the Empire Justice Center commented that "[A]n affected individual must . . . jump through hoops to obtain [overpayment] relief. This seems wholly unnecessary when SSA has identified the individuals and confirmed they are not at fault."[36]  Instead, as U.S. Representative Dwight Evans commented, SSA could "prevent[] all of these harms" by simply "send[ing] a single notice informing claimants that they were overpaid and that the overpayment was waived."[37]  Multiple experienced legal services organizations agreed.[38]

### 6. The IFR Violates the Due Process Clause.

Plaintiffs are likely to succeed on their Due Process claims.  Courts have long recognized that "a person's interest in federal entitlements may constitute a protected property interest," including "public assistance benefits" and "social security disability benefits."  *Ford v. Shalala*, 87 F. Supp. 2d 163, 175 (E.D.N.Y. 1999), *judgment entered sub nom. Ford v. Apfel*, No. CV-94-2736 (CPS), 2000 WL 281888 (E.D.N.Y. Jan. 13, 2000) (citing *Goldberg*, 397 U.S. at 261–62; *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).  When "government benefits or entitlements

---

[36] Ex. A-22.

[37] Ex. A-26.

[38] *See* Ex. A-21 ("SSA admits that beneficiaries whose overpayments were not processed timely are affected in a uniformly detrimental manner. Yet, the simplified-waiver relief is only available to beneficiaries who are aware of the waiver process and able to make a timely request for a waiver.  Thus, the same set of circumstances leading to overpayments—due to no fault of the beneficiary—will result in some beneficiaries having their repayment obligation waived, while others will not receive that relief because they were not aware of their right to request a waiver."); Ex. A-23; Ex. A-24; Ex. A-28; Ex. A-29, Linda Landry, Disability L. Ctr., Comment Letter on Interim Final Rule on Waiver of Recovery of Certain Overpayment Debts Accruing during the Covid-19 Pandemic Period (Oct. 26, 2020), https://www.regulations.gov/comment/SSA-2020-0045-0026.

are conditioned upon financial need," as SSI benefits are, the danger of a due process violation carries "correspondingly greater weight." *Isaacs v. Bowen*, 865 F.2d 468, 476 (2d Cir. 1989).

The bedrock of the right to due process is the right to be told of that process in a timely written notice. *See Ford v. Shalala*, 87 F. Supp. 2d 163, 178–81 (E.D.N.Y. 1999), *judgment entered sub nom. Ford v. Apfel*, No. CV-94-2736 (CPS), 2000 WL 281888 (E.D.N.Y. Jan. 13, 2000) (finding SSI adjustment notices violated due process where they did not explain standards underlying agency decision, depriving claimants of opportunity to "evaluate whether an appeal is warranted"); *accord Davis v. Proud*, 2 F. Supp. 3d 460, 486 (E.D.N.Y. 2014) (to satisfy due process, benefits adjustment notices must accurately explain "how to appeal" agency's determination).

Here, the Overpayment Notices that were sent to recipients failed to adequately inform them of their rights and were seriously flawed in at least three ways. *First*, the Notices failed to inform recipients that SSA was applying a presumption that recipients were *not* at fault in causing any overpayments covered by the IFR. To the contrary, the Notices indicated that it "ha[d] to be true" that "[i]t wasn't your fault that you got too much SSI money."[39] That is just incorrect. The IFR expressly waived this provision. *Second*, that, under the streamlined waiver, recovery of any overpayment debt covered by the IFR would be presumed to be against equity and good conscience. As such, there was no requirement in the IFR that recipients establish that they would face financial difficulties in paying back the overpayment. *Third*, for overpayments covered by the IFR, the Notices failed to explain that recipients would *not* be required to complete the Form SSA-632 or provide supporting documentation or information about their income and expenses. To the contrary, SSA's Overpayment Notices specifically and wrongly

---

[39] *See, e.g.*, Ex. I-09; Ex. I-15.

directed recipients to "ask for waiver at any time by completing the waiver form and returning it to us.  The form is called "Request for Waiver of Recovery or Change in Repayment Rate, Form SSA-632."  Moreover, when Named Plaintiffs and advocates around the country called SSA, they were not told about the streamlined waiver and instead were advised to complete the standard waiver form.  *See* Compl. ¶¶ 159, 161; Ex. H, Walters Decl., ¶¶ 8-9; Ex. G, Landry Decl., ¶ 6; Ex. C, Marinacci Decl., ¶ 9; Ex. D, Hernandez Decl., ¶ 7.

In addition to issuing inadequate notices, SSA violated SSI recipients' Due Process rights by failing to establish policies to effectively implement the streamlined waiver.  The failure had the effect of denying recipients the opportunity to meaningfully engage with the Agency, and thus depriving them of benefits to which they were entitled without adequate process. In other words, even when SSI recipients or their representatives were aware of the streamlined waiver, they were not provided an opportunity to be heard "at a meaningful time and in a meaningful manner" with regard to recoupment of benefits.  *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (analyzing whether agency's regulations and procedures for terminating disability benefits comported with this due process standard).

SSA's flawed and confusing sub-regulatory guidance, described *supra* pp. 9-12 & n.16, fails to properly inform SSA employees of how and when to process a streamlined waiver.  For example, SSA issued sub-regulatory guidance that limited the streamlined waiver to only overpayments coded in a specific manner—despite there being no such limitation in the IFR. Ex. A-16 (EM-20037 SEN REV).  SSA staff regularly refused to accept requests for the streamlined waiver via telephone, and regularly denied waiver requests without citing specific reasons for the denials.  As a result, recipients and advocates around the country have almost uniformly been unable to actually *file* a streamlined waiver request; instead they have resorted to

filing the standard waiver.  By refusing to grant streamlined waivers to those entitled to them, SSA has created a substantial "risk of erroneous deprivation" of recipients' interest in their benefits.  *Matthews*, 424 U.S. at 335.  Even when streamlined waivers have been submitted by recipients and accepted by SSA staff, SSA has failed to stop recoupment on these overpayments while processing the streamlined waiver request.  This stop action is required when waivers are filed.  Compl. ¶ 106.

### 7.  The IFR Violates the Equal Protection Guarantee of the Fifth Amendment.

Plaintiffs are also likely to succeed on their claim that the IFR violates the equal protection guarantee of the Fifth Amendment.  In the benefits context, a classification without a rational basis is unlawful.  *See Windsor v. U.S.*, 699 F.3d 169, 180 (2d Cir. 2012) (quoting *Thomas v. Sullivan*, 922 F.2d 132, 136 (2d Cir. 1990)), *aff'd*, 570 U.S. 744, 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013).  That is, if a differentiation in treatment of benefits recipients does not have a "rational relationship [with] some legitimate governmental purpose," it will be found unconstitutional.  *Roman Cath. Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*, 128 F. Supp. 3d 566, 584 (E.D.N.Y. 2015) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)); *accord Weisenberg v. Town Bd. of Shelter Island*, 404 F. Supp. 3d 720, 732 (E.D.N.Y. 2019) (citing *Romer v. Evans*, 517 U.S. 620, 631 (1996)).

According to the SSA, "[b]ecause of the unique nature of the COVID-19 pandemic, [the SSA's] unprecedented response to it, and its uniform impact on this group of beneficiaries, we are revising our rules to use a simplified waiver process for affected beneficiaries . . . ."  IFR at 52,910.  Despite this stated purpose, as has been discussed above, the IFR excludes many similarly situated SSI recipients from receiving the streamlined waiver based on arbitrary and capricious distinctions.  It is simply unjust that two similarly situated SSI recipients are accorded different waiver requirements depending on circumstances beyond their control—such as when

38

SSA discovered their overpayment or by what method it was discovered.  *See Jones v. Califano*, 576 F.2d 12, 18–20 (2d Cir. 1978) (finding "unequal justice" where SSA routinely misapplied its own budgeting rules, and each individual recipient had to appeal their budgeting determination to have the amount properly adjusted, such that "[t]hose who request a hearing will get their full benefits; those who fail to request a hearing will not.").  The distinctions here—described at length *supra* Argument § I(B)—also lack a rational basis and are unlawful.

### C.   Named Plaintiffs and Putative Class Members Have Presented a Serious Question That Is Fair Grounds for Trial, and the Balance of Hardships Tips Decidedly in Plaintiffs' Favor.

While Named Plaintiffs and the class are likely to succeed on the merits of their claims, *see supra* Argument § I(B), Plaintiffs are entitled to preliminary relief because they have presented serious questions that are fair grounds for trial and the balance of hardships tips decidedly in their favor.  *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  The Second Circuit has explained that "[t]he 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims . . . . "  *Id.*  Therefore, even if the facts outlined above had not been sufficient for this Court to determine that Plaintiffs were more likely than not to prevail, at the very least, they raise serious questions on the merits of Plaintiffs' claims.  *E.g.*, *Saget*, 375 F. Supp. 3d at 366 (granting preliminary injunction on the independent ground that "at the very least, there are serious questions going to the merits of Plaintiffs' equal protection claim").

The balance of hardships tips heavily in favor of Plaintiffs.  As discussed *supra* Argument § I(A), Plaintiffs suffer irreparable harm every day.  For recipients of subsistence benefits, the "loss of even a small portion of" the funds "can constitute irreparable injury warranting issuance of a preliminary injunction," *Morel*, 927 F. Supp. at 635, as the deprivation of the "very means

by which to live" simply "cannot be rectified through the payment of benefits at a later date." *Olson*, 281 F. Supp. 2d at 486.   For the Named Plaintiffs and putative class members, the Overpayment Notices and attempts to recoup benefits by the SSA are clearly and demonstrably incorrect under the SSA's own guidance.  *See* Ex. A-06 (EM-21050 REV); Ex. A-07 (EM-20014 REV 4); *see also* Compl. ¶¶ 175–77 (assessing overpayment on Ms. Campos and K.C. based on pandemic-related unemployment benefits); ¶¶ 235–239 (Mr. Marsh); ¶¶ 201–203 (assessing overpayment for Ms. Adams based on adoption assistance funds).

SSA acknowledged these hardships in the IFR when it noted that "it would be against equity and good conscience to collect" debts that "are not the fault of the affected beneficiaries due directly to [SSA's] strategic decision to reprioritize workloads to stop manually processing certain actions." IFR at 52,909.  In fact, SSA admitted that requiring recipients to "prove the requirements for waiver by submitting the necessary evidence for [SSA] to consider" under the standard waiver would "burden the affected beneficiaries," such that delaying the IFR for public comment would be "contrary to the public interest," and also provided "good cause for dispensing with the [statutory] 30-day delay in the effective date of [the] rule." IFR at 52,912. Accordingly, requiring affected beneficiaries to engage in that burdensome process while awaiting a final ruling in this matter would also place an undue burden on them which can be avoided by entry of a preliminary injunction.

On the other side of the scale, Defendant will suffer minimal, if any, harm as a result of the relief Plaintiffs seek:  a preliminary injunction restoring the overpayment and recoupment pause that existed at the beginning of the COVID-19 National Emergency and before the issuance of the IFR, and applying that pause to *all* SSI recipients (e.g., those whose overpayments were assessed both manually and automatically).  Again, the Court needs to go no

further than the IFR to see SSA admit that the IFR "results in administrative cost savings, as well as burden reduction for the public," with those cost savings resulting from "savings of 30 minutes to waive the overpayments for those requesting relief."  IFR at 52,913.  While it is true that pausing SSA's pandemic-era recoupments will increase the Agency's outlays in terms of benefits, that additional cost will be at least partially offset by administrative savings from reduced processing of overpayments and waivers, and in any event, it is no worse a burden on the Agency than the one it took on voluntarily at the start of the pandemic and kept in place for many months.

## II.    The Proposed Class Should Be Certified.

Named Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) on behalf of themselves and a class of:

> All current and future recipients of Supplemental Security Income
> who have been or will be assessed an overpayment debt incurred at
> any point between March 2020 and the end of the COVID-19
> National Emergency.

Because the proposed class satisfies the requirements of Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure, and because class certification is essential to the fair and efficient adjudication of this controversy, Named Plaintiffs' motion for class certification should be granted.

"[C]ourts routinely grant provisional class certification for purposes of entering injunctive relief."  *See Carrillo v. Schneider Logistics, Inc.*, No. CV11-8557 CAS (DTBx), 2012 WL 556309, at *9 (C.D. Cal. Jan. 31, 2012), *aff'd*, 501 F. App'x 713 (9th Cir. 2012); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 269-70 (2d Cir. 2006); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020) (provisionally certifying class "for purposes of preliminary injunction proceedings").  A provisional class differs from a fully certified class only in that its

41

application is limited and its definition subject to modification until final certification.  *See Chavarria v. N.Y. Airport Serv., LLC*, 875 F. Supp. 2d 164, 169 (E.D.N.Y. 2012) (discussing provisional certification and subsequent modification); *In re Arotech Corp. Sec. Litig.*, No. 07-CV-1838 (RJD)(VVP), 2010 WL 2301195, at *9 (E.D.N.Y. June 7, 2010).  A provisional class will be certified if it meets the same Rule 23(a) and Rule 23(b) requirements used to certify a full class.  *See Berkson v. Gogo LLC*, 147 F. Supp. 3d 123, 140 (E.D.N.Y. 2015); *In re Arotech Corp. Sec. Litig.*, No. 07-CV-1838 (RJD)(VVP), 2010 WL 2301195, at *9 (E.D.N.Y. June 7, 2010).

**A.  Courts Routinely Certify Classes in Similar Cases.**

Courts have frequently certified classes of applicants and recipients of public benefits seeking to challenge a policy that reduces their public benefits or delays access to them.  *See e.g.*, *White v. Mathews*, 559 F2d 852, 858 (2d Cir. 1977) (certifying class of prospective SSDI recipients who had received initial adverse rulings for receipt of SSDI benefits and experienced long delays before hearing); *Morel*, 927 F. Supp. 622, 634 (certifying class of recipients of federal and state public benefits who suffered the protracted denial of aid continuing benefits); *Mayer*, 922 F. Supp. at 907–08 (certifying class of Medicaid recipients of personal care services whose care was threatened with reduction or termination even though their need had not changed); *Catanzano v. Dowling*, 847 F. Supp. at 1074 (noting that the court had previously certified a class of all recipients of Medicaid in Monroe County who received home health care, and who are threatened with receiving less care than that ordered by their treating physicians).

**B.  The Class Satisfies the Requirements of Rule 23(a).**

**1.  The Class Is So Numerous That Joinder of All Class Members Is Impracticable.**

Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Impracticable does not mean impossible, but simply

difficult or inconvenient. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). The Second Circuit has held that the numerosity requirement is presumptively satisfied where there are at least forty class members. *See Marisol A.*, 126 F.3d at 376 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)); *Stinson v. City of New York*, 282 F.R.D. 360, 369 (S.D.N.Y. 2012) (citation omitted); *Alexander A. ex rel. Barr v. Novello*, 210 F.R.D. 27, 33 (E.D.N.Y. 2002) (citation omitted).

Here, there is no doubt that more than 40 SSI recipients have been assessed overpayments since March 2020—the number is likely many orders of magnitude greater. Per the Social Security Administration, about 8.1 million people received SSI benefits as of December 2019.[40] At the end of 2020, over 1 million SSI recipients were in scheduled repayment plans.[41] During that same year, the SSA waived 82,591 overpayments and recovered almost 1.5 million dollars in overpayments.[42] It is likely that tens of thousands of SSI recipients have been or will be affected by COVID-19 related overpayments, far surpassing the forty litigants required for class certification. The fact that the size of the proposed class has not been precisely determined "is not a fatal defect in the motion; a class action may proceed upon estimates as to the size of the proposed class." *Jane B. v. N.Y.C. Dep't of Soc. Servs.*, 117 F.R.D. 64, 70 (S.D.N.Y. 1987) (quoting *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 324 (E.D.N.Y. 1982)); *see also Robidoux*, 987 F.2d at 935.

---

[40] Ex. A-30, *Fast Facts & Figures About Social Security, 2020*, SOC. SEC. OFF. OF RET. & DISABILITY POL'Y, https://www.ssa.gov/policy/docs/chartbooks/fast_facts/2020/fast_facts20.html#page24 (last accessed Oct. 22, 2021) (tab "SSI Program").
[41] Ex. A-31, Letter from Off. of the Comm'r, Soc. Sec. Admin., to Sen. Charles Grassley at 6 (Dec. 29, 2020), https://www.ssa.gov/legislation/Agency%20Annual%20Overpayment%20Waivers%20Report%202020.pdf.
[42] *Id.*

## 2.   Class Members Share Common Issues of Law and Fact.

Rule 23(a)(2) requires that the claims of a proposed class raise common questions of law or fact.  To satisfy this criterion, Plaintiffs' "claims must depend upon a common contention . . . of such a nature that it is capable of class-wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Common questions of law and fact will drive the resolution of this case:  *e.g.*, whether the IFR's limitations are arbitrary and capricious and whether the revised Overpayment Notice provides sufficient information for putative class members to understand their rights.  These common questions are more than adequate to satisfy the commonality requirement.  *See M.G. v. N.Y.C. Dep't of Educ.*, 162 F. Supp. 3d 216, 236 (S.D.N.Y. 2016) (rejecting argument that no commonality existed because government program was "individualized to each student's needs" where plaintiffs sought "injunctive relief from limitations that the [regulation] places on students' access to Related Services overall—a matter that can and should be resolved on a class-wide basis"); *Ligon v. City of New York*, 288 F.R.D. 72, 82 (S.D.N.Y. 2013) (because putative class members were "allegedly subjected to the same unlawful conduct . . . under the auspices of a single [government] program . . . , plaintiffs readily meet the commonality requirement as described in *Wal-Mart*.").[43]

---

[43] *See also Guadagna v. Zucker*, 332 F.R.D. 86, 95 (E.D.N.Y. 2019) (certifying class where plaintiff "faults the Defendant for failing to implement a uniform policy that protects the rights of enrollees transferring from a closing plan"); *Davis v. City of New York*, 296 F.R.D. 158, 166 (S.D.N.Y. 2013) (commonality was satisfied where a centralized policy promulgated by senior city officials, rather than delegated discretion exercised by particular individuals, caused the injuries to putative class members); *Cruz v. Zucker*, 195 F. Supp. 3d 554, 563, 565–66 (S.D.N.Y. July 5, 2016) (denying request to decertify a class for lack of commonality where the class claimed that DOH wrongfully denied Medicaid coverage for gender dysphoria), *modified on other grounds on reconsideration by* 218 F. Supp. 3d 246 (S.D.N.Y. Nov. 14, 2016).

### 3.   Named Plaintiffs' Claims Are Typical of the Class.

To establish typicality, the class members must show that "each class member's claim arises from the same course of events." *Reynolds*, 118 F. Supp. 2d at 389 (internal citations omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 937–38.  In addition, "named plaintiffs satisfy the typicality requirement when all members of the class would benefit from the named plaintiffs' action." *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 201 F.R.D. 326, 332 (S.D.N.Y. 2001); *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 206 (E.D.N.Y. 2005) ("That all members of the class would benefit from the named plaintiffs' action demonstrates that the typicality requirement is met.").

The Named Plaintiffs' claims are typical of those of the rest of the class because each Plaintiff, like all members of the class, is a recipient of SSI whose benefits were reduced and who were unable to obtain a waiver as a result of the SSA's arbitrary IFR and flawed streamlined waiver process.  All were assessed overpayments for one or more months in the period March 2020 through present, and none were able to obtain a streamlined waiver of those overpayments.

Because the Named Plaintiffs and putative class members were all subject to the same course of conduct by SSA, and their claims are based on the same legal theories, typicality is satisfied.  *See Lovely H.*, 235 F.R.D. at 256 (typicality established where both named plaintiffs and putative class members were disabled welfare recipients who experienced "involuntary reassignment" to three centralized offices for the purpose of receiving welfare-related services, which plaintiffs claim "violated their rights to be free from disability-based discrimination and denied them due process of law"); *Hilton v. Wright*, 235 F.R.D. 40, 52 (N.D.N.Y. 2006)

45

(typicality met where "the claims of the representative parties and the members of the prospective class all center around defendants' application" of a single policy).

### 4.  Named Plaintiffs and Their Counsel Adequately Represent the Class.

Fed. R. Civ. P. 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class, measured by two factors: (1) class counsel must be qualified, experienced, and generally able to conduct the litigation, and (2) the interests of the named plaintiffs cannot be antagonistic to those of the remainder of the class. *See Reynolds*, 118 F. Supp. 2d at 390. Both factors are met here.

Counsel are experienced in class action litigation in federal and state courts, including matters relating to public benefits, and will prosecute this action vigorously and competently. NYLAG is a public-interest law firm with extensive experience in public assistance and class action litigation, including in the courts of New York State and in the United States District Courts in New York.  JIA is a nonprofit legal advocacy firm representing low income older adults on issues relating to income stability and access to health care, with experience and expertise in public benefit programs relied upon by older adults, including Social Security law, and experience in class action litigation across the country, including Social Security matters. Finally, Arnold & Porter Kaye Scholer LLP, a law firm with extensive global reach, experience and deep knowledge across geographic, cultural, technological and ideological borders, has extensive experience in class-action cases, and has previously served as co-counsel with NYLAG and Justice in Aging in a case against SSA on behalf of SSI recipients.  The Named Plaintiffs are able to fairly represent the class.  The interests of the Named Plaintiffs are identical to those of the proposed class because they are all SSI recipients subject to the same arbitrary policy.  The relief Named Plaintiffs seek will have no detrimental effect on any of the other putative class members, but will only benefit them as it will increase their chances of obtaining

46

benefits to which they are entitled.  Thus, the proposed class satisfies the requirements of Rule 23(a)(4).

### 5.   The Class Satisfies the Requirements of Rule 23(b)(2).

Plaintiffs seek certification here under Rule 23(b)(2), which allows for the maintenance of a class action if "[1] the party opposing the class has acted or refused to act on grounds that apply generally to the class, [2] so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Both of these requirements are met here.  SSA's actions apply equally to every member of the proposed class. Members of the proposed class and subclass are all SSI recipients who have been or will be assessed overpayments during the COVID-19 National Emergency.  Named Plaintiffs seek a declaration that SSA's policies and practices violate putative class members' rights.  This requested relief is necessary to protect these putative class members' constitutional and statutory rights.

Courts in this Circuit have routinely held that cases of the nature presented here— alleging systemic acts or failures to act by a government entity—are uniquely appropriate for class certification under Rule 23(b)(2).  *See Shakhnes*, 740 F. Supp. 2d at 628 ("[C]ivil rights actions . . . alleging systemic administrative failures of government entities [ ] are frequently granted class action status under Rule 23(b)(2)."); *see also Clark v. Astrue*, 274 F.R.D. 462, 471 (S.D.N.Y. 2011) (approving nationwide class under 23(b)(2) in challenge to generally applicable Social Security Administration policy); *Lovely H*., 235 F.R.D. at 257 (approving Rule 23(b)(2) class of city welfare recipients with disabilities, challenging the city's decision to involuntarily transfer all class members to different offices to receive welfare-related services); *M.K.B.*, 445 F. Supp. 2d at 442 (certifying immigrant class seeking to correct "systemic deficiencies" in the way New York agencies administered statutes and regulations "governing immigrant eligibility for

benefits"); *Mayer v. Wing*, 922 F. Supp. 902, 908 (S.D.N.Y. 1996) (certifying plaintiff class whose home health care services had been reduced or terminated by the state and/or city). Here, SSA has systemically failed to protect putative class members' rights. Thus, certification of the proposed class under Rule 23(b)(2) is appropriate.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that this Court:

1.    Certify a class, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, consisting of:

> All current and future recipients of Supplemental Security Income who have been or will be assessed an overpayment debt incurred at any point between March 2020 and the end of the COVID-19 National Emergency, which is ongoing.

2.    Grant a class-wide preliminary injunction prohibiting:

> Defendant from assessing new or recouping already existing overpayments incurred at any point between March 2020 and the end of the COVID-19 National Emergency, which is ongoing;

3.    Grant a preliminary injunction requiring:

> Defendant to resolve Named Plaintiffs' pending applications for relief and to restore to Named Plaintiffs all recouped benefits stemming from an alleged overpayment occurring during the period March 2020 through present;

4.    Award such other and further relief as this Court deems just and proper.

Dated: New York, New York
         October 26, 2021

Respectfully submitted,

By:  */s/ Sheila S. Boston*
       Sheila S. Boston
       Carmela T. Romeo
       Tyler J. Fink (*pro hac vice* to be filed)
       ARNOLD & PORTER KAYE SCHOLER LLP
       250 West 55th Street
       New York, NY 10019-9710
       Telephone:  (212) 836-8000
       Email:  sheila.boston@arnoldporter.com
       Email:  carmela.romeo@arnoldporter.com
       Email:  tyler.fink@arnoldporter.com

Kathryn Lang (*pro hac vice* to be filed)        Danielle Tarantolo
Regan Bailey (*pro hac vice* to be filed)        Michelle Spadafore
Carol Wong (*pro hac vice* to be filed)          Elizabeth Jois
JUSTICE IN AGING                                 Jessica Ranucci
1444 Eye Street NW, Suite 1100                   NEW YORK LEGAL ASSISTANCE GROUP
Washington, DC 20005                             100 Pearl Street, 19th Floor
Telephone: (202) 683-1997                        New York, NY 10004
Email: klang@justiceinaging.org                  Telephone:  (212) 613-5000
Email: rbailey@justiceinaging.org                Facsimile:  (212) 750-0820
Email: cwong@justiceinaging.org                  Email:  dtarantolo@nylag.org
                                                 Email:  mspadafore@nylag.org
                                                 Email:  ejois@nylag.org
                                                 Email:  jranucci@nylag.org

49